NANCY DALRYMPLE *vs.* TOWN OF WINTHROP & another.[1]

No. 98-P-1377.

Suffolk. December 9, 1999. - December 28, 2000.

Present: PERRETTA, GILLERMAN, & LENK, JJ.

*Evidence,* Relevancy and materiality, Pattern of conduct. *Practice, Civil,* Instructions to jury, Judgment notwithstanding verdict, Directed verdict, New trial, Attorney's fees, Costs, Interest. *Damages,* Remittitur, Attorney's fees, Under anti-discrimination law, Punitive. *Anti-Discrimination Law,* Sex, Termination of employment, Damages, Attorney's fees. *Municipal Corporations,* Police. *Police,* Discharge.

At the trial of a claim of employment discrimination and retaliation based on gender, the judge's rulings on objections to the plaintiff's testimony did not provide any ground for reversal. [616-617]

Defendants in a civil action did not properly preserve for appellate review claims with respect to the judge's instructions to the jury [617-618], and the defendants waived their right to appeal from the denial of their motions for directed verdict and for judgment notwithstanding the verdict, where they did not renew their motions for directed verdict at the close of all the evidence [618-619].

In a civil action, there was no merit to the defendants' claim on appeal that the verdict was the result of jury confusion. [619]

No basis appeared on the record of civil claims for gender discrimination in employment and retaliation to disturb the judge's ruling denying remittitur on the question of the amount of compensatory damages [619-621], or punitive damages [621].

In a gender discrimination case, a chief of police was properly held individually liable for acts he committed in his professional capacity that discriminated against a police officer. [621]

The prevailing plaintiff in a civil action was entitled under G. L. c. 151B, § 9, to reasonable attorney's fees and costs in connection with the defendants' appeal. [621-622]

CIVIL ACTION commenced in the Superior Court Department on August 3, 1995.

[1]Angelo LaMonica, the chief of police of Winthrop, was sued both in his official capacity and individually.

The case was tried before *Thayer Fremont-Smith*, J.

*David A. Robinson* (*James J. Cipoletta* with him) for the defendant.

*Maxine Sushelsky* for the plaintiff.

PERRETTA, J. This appeal arises out of a jury's award of compensatory and punitive damages on a complaint brought by Nancy Dalrymple pursuant to G. L. c. 151B, § 4, alleging that the town of Winthrop and its chief of police, Angelo LaMonica, had discriminated against her on the basis of her gender and then, when she complained to the Massachusetts Commission Against Discrimination (MCAD), retaliated by dismissing her from the police force. On appeal the defendants claim error by the Superior Court judge in his evidentiary rulings, jury instructions, and denials of their various motions attacking the sufficiency of the evidence and seeking remittitur.[2] We affirm the judgment.

1. *The evidence.* Evidence of the following facts was presented. After Dalrymple received a Bachelor of Arts degree and a Master of Science degree in the fields of political science and criminal justice administration, respectively, she worked in a bank until 1980. That year, the town hired Dalrymple as a reserve police officer. Two years later, she became a permanent Winthrop police officer, the first woman to hold that position. She attended the police academy and holds certificates of completion of additional courses and training in the areas of first aid, fingerprinting, operation of the breathalyzer, and investigation of sex offenses (rape, child abuse, and sexual assault).

Dalrymple testified at length about the treatment she experienced after she became a permanent member of the Winthrop police force.[3] Her male colleagues left magazine pictures of naked women in desk drawers or on desktops. At the police station, some police officers watched videotapes containing sexually explicit material and told Dalrymple to "get out" if she didn't approve. As part of an investigation she had been

---

[2]The jury awarded Dalrymple damages in the total amount of $575,000.

[3]Dalrymple brought this action on August 3, 1995. The trial judge instructed the jury, on numerous occasions, that evidence of any event occurring more than three years prior to Dalrymple's commencement of this action was limited to a showing of a pattern of discriminatory conduct that might have continued into the time period encompassed by the complaint and was not relevant to any consideration of damages.

working on in early 1989, Dalrymple obtained an arrest warrant. Angelo LaMonica, a lieutenant at the time,[4] took the warrant from Dalrymple and told her that he would call her if he found the individual named in the warrant. When LaMonica located the individual, he did not tell Dalrymple and, instead, asked two male officers to make the arrest.

A little later, April of 1989, Dalrymple was assigned to cover the telephones at the station while all the male officers were assigned to participate in a drug raid. When Dalrymple asked the supervising officer why she had been excluded from participating in the raid, he told her: "We're having a drug raid, and we need all the manpower we can get." Dalrymple spoke to the then chief of police about her exclusion from the raid and also expressed her concerns in a letter to the board of selectmen. Thereafter, one of the selectmen, during an informal conversation, put his arm around Dalrymple and asked her why she would want to participate in a drug raid given the fact that she had a young child at home. Dalrymple informed the selectmen that the male officers who had participated in the raid also had children. Dalrymple also filed a complaint with the MCAD.[5]

On yet another occasion, Dalrymple assisted in the transportation of a juvenile, arrested by another officer, to the police station. When the juvenile's mother appeared at the station demanding to know why her son had been arrested, an officer informed her that her son's arrest had occurred because Dalrymple, "being a young lady, couldn't handle the situation . . . ."

In the fall of 1990, Dalrymple's regular work shift, to which she had been assigned for ten years, was changed, and she was reassigned to a shift which put her under the direct supervision of the same officer who had been in charge on the night of the drug raid from which she was excluded. She filed a grievance with LaMonica, as required under the union contract. He denied the grievance, and Dalrymple pursued her contract remedy and filed another complaint with the MCAD.

Next, in 1991, came the omission of Dalrymple's name from a memorandum listing assignments for firearm recertification.

---

[4] The board of selectmen appointed LaMonica the acting chief of police in November, 1989, and permanent chief in April of the following year.

[5] Dalrymple prevailed on that complaint and was awarded damages, $25,000, for emotional distress and attorney's fees pursuant to G. L. c. 151B, § 9. See *Winthrop* v. *Dalrymple, post* 1112 (2000).

After Dalrymple pointed out the oversight, her name was put on an updated list. However, unlike every other officer on the list, her name appeared without reference to her official title.

In July, 1991, Dalrymple was several months into her second pregnancy and asked that she be assigned to duty within the station, a request which had been granted her during her first pregnancy; similar requests, for different and various reasons, had been granted her male colleagues. Rather than granting the request, LaMonica, on August 21, 1991, relieved her from duty without pay. Dalrymple filed another complaint with the MCAD as well as a court action. See note 8, infra. As a result of those proceedings, she returned to work on September 21, 1991, and was assigned duties within the station during her pregnancy. She worked within the station from September 21 through October 18, 1991.

After the birth of her second child on November 22, 1991, Dalrymple took sick and personal leave and then requested, pursuant to the town's by-law, a three-month, unpaid leave of absence. When that leave of absence expired on March 15, 1992, Dalrymple requested and was granted a second leave of absence until June 15, 1992. On June 11, 1992, four days before the expiration date of her second leave, Dalrymple wrote a letter to LaMonica and the personnel board requesting an additional eight-week leave of absence pursuant to G. L. c. 149, § 105D. LaMonica responded that he would facilitate her request which only the town's personnel board had authority to grant.

Although she received no word from the personnel board prior to the expiration of her leave on June 15, Dalrymple did not return to work on that date. On June 30, the personnel board denied her request on the basis that she already had received more than eight weeks maternity leave as part of her six-month leave of absence. On that same day, June 30, La-Monica ordered Dalrymple to report for duty on July 3, 1992, or face the possibility of disciplinary action. Dalrymple then contacted her doctor, who wrote a letter, dated July 1, 1992.[6] The doctor stated in that letter that Dalrymple would not be

---

[6]During March and June, 1992, while on leave, Dalrymple sought treatment for a pre-existing injury, carpal tunnel syndrome, to her right hand and for pain in her left hand. She had injured her right hand about three years earlier, while discharging over three rounds of ammunition at a police firearms range. However, she did not appreciate the extent of her injury until several months

able to return to work for thirty to forty-five days because of a prior work-related injury to her right hand as well as a recently developed injurious condition (tendinitis) in her left wrist that was related to her pregnancy. Dalrymple did not return to work as ordered. Instead, her husband brought the doctor's letter to the police station and slipped it under the door to LaMonica's office. LaMonica then issued a second order, requiring Dalrymple either to report for duty on July 15 or to face disciplinary action. Believing that her injuries prevented her from carrying out her duties, Dalrymple did not report for duty. LaMonica suspended her for five days, effective July 8, citing her failure to return to work on June 15 and to obey his order that she report for duty on July 3.

Dalrymple appealed her suspension to the board of selectmen on July 10. While her appeal was pending, LaMonica issued another order, report for duty on July 15 or face further disciplinary action. Remaining firm in her belief that her injuries rendered her unable to perform her duties, Dalrymple did not report for duty. As warned, LaMonica recommended to the board of selectmen that it initiate proceedings to consider taking disciplinary action against Dalrymple, including her dismissal from the police force. On July 21, the board upheld Dalrymple's suspension and notified her that a hearing would be conducted to determine whether she should be dismissed.

On August 10, 1992, the board concluded that Dalrymple should be dismissed from the police force for "conduct unbecoming a police officer and substantial misconduct which adversely affects the public interest by impairing the efficiency of the Winthrop Police Department." Dalrymple appealed the board's decision to the Civil Service Commission pursuant to G. L. c. 31, § 43.

On August 1, 1994, the commission ordered that Dalrymple be reinstated upon a medical determination that she was fit to return to duty. She returned to work on December 5, 1994, after

later, when she slipped and fell on her right side and sought medical attention. Her doctor advised her that she had carpal tunnel syndrome in her right hand. After a doctor appointed by the town verified this diagnosis, LaMonica, on August 6, 1990, granted her benefits for sick time and medical bills related to her injury. Dalrymple thereafter, on August 3, 1992, requested benefits for her ongoing injury, carpal tunnel syndrome, as well as for her newly developed injury, tendinitis in her left wrist. LaMonica denied that request, and the board upheld the denial.

two medical examinations.[7] Prior to her suspension and dismissal, Dalrymple had an exemplary record, that is, positive work evaluations and no disciplinary reports.

2. *Objections to Dalrymple's testimony.* It is the defendants' claim that each of the three rulings by the judge on their objections to Dalrymple's testimony requires reversal of the judgment.

When asked why LaMonica would not accept her verified medical reason for not returning to work, Dalrymple stated that she believed that the defendants were angry because she had filed discrimination complaints and that they wanted to punish her for doing so. Dalrymple's response to the question was a statement of the obvious rather than an inadmissible and prejudicial opinion touching on an ultimate issue. See *Puopolo* v. *Honda Motor Co.*, 41 Mass. App. Ct. 96 (1996).

Dalrymple was allowed to testify that she was using her allotted number of vacation days in order to be present throughout the trial on her complaint. She was also allowed to ask two police officers who appeared on behalf of the defendants if they were on duty while at the trial, and both replied that they were. The defendants claim that this evidence "was a deceptive and prejudicial effort to show 'disparate' treatment." The evidence was not offered to show past or present disparate treatment. We think it within the broad range of the judge's discretion to conclude that Dalrymple's testimony had some relevance to the question of damages and that her cross-examination of the officers was an appropriate line of inquiry intended to dispel any notion that the officers favored the defendants' position, that is, that they voluntarily appeared to support the defendants' position.

As described by Dalrymple, LaMonica was "upset" when she returned to work in September, 1991.[8] When asked how she knew that LaMonica was displeased, Dalrymple stated that she saw him interviewed on television and heard him say "[t]hat he

---

[7]After the town's physician approved Dalrymple's return to work, the town referred her to another doctor who concluded that Dalrymple's treatment had been reasonable and necessary and that she was now capable of returning to work.

[8]Consistent with the judge's ruling, Dalrymple did not inform the jury that she had returned to work pursuant to a Superior Court order that she be allowed to return to work and that she be assigned duty within the police station throughout her pregnancy.

was upset" that he "hoped the town would follow this through or appeal it."

The defendants argue that this testimony was inadmissible under *Bain* v. *Springfield*, 424 Mass. 758, 759-760, 766-767 (1997). In that case, the plaintiff sent a letter to the mayor in which she described his appointment of a white male to a position she had sought as "blatant discrimination." Her letter and other remarks were detailed in a local news publication along with the mayor's response. He labeled the plaintiff's allegations as "baseless," "meritless," and an example of someone attempting "to manipulate the civil rights laws for personal gain."

In rejecting Bain's argument that the mayor's statement provided an evidentiary basis for her claim of retaliation, the court held: "What we most emphatically cannot countenance as an instance of retaliation is the mayor's response in the local newspaper to the charges against him. The newspaper quoted Bain's serious and damaging charges against the mayor, an elected official. He was entitled to respond in the same forum, to defend himself and to state what political judgments seemed appropriate so long as they were not defamatory . . . . The interest in remedying discrimination is weighty but not so weighty as to justify what amounts to a restriction on core political speech." *Id.* at 766-767.

We think *Bain* inapposite. Not only were the nature of the remarks and the circumstances under which they were made very different in *Bain*, so also was the purpose for which they were offered. Dalrymple's testimony concerning LaMonica's reaction to her return to duty in 1991 was not offered as evidence of a retaliatory act. Rather, that testimony was offered for the purpose of showing a pattern of discriminatory conduct that Dalrymple alleged continued into the time period encompassed by her complaint. See note 3, *supra*.

3. *The jury instructions.* The defendants allege error in the judge's refusal to instruct the jury on the elements of gender discrimination and retaliation in accordance with their written requests. During the charge conference, the defendants made no mention of their written requests nor did they make any argument against or make any objection to the judge's proposed instructions. At the conclusion of the charge, the defendants requested and the judge gave clarification on one point relating to damages. However, they made no objection to the instructions. See Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974). The argument

has not been preserved for appellate review, and we do not consider it. See *Clark* v. *Rowe,* 428 Mass. 339, 340-341 (1998), and cases therein cited.

4. *The sufficiency of the evidence.* In count one of her complaint, Dalrymple alleged that both LaMonica (in his official capacity) and the town had discriminated against her because of her gender. Count two charged them (LaMonica in his official capacity) with retaliating against her for complaining about their discriminatory conduct.

At the close of Dalrymple's case, the town filed a motion for a directed verdict on count one of the complaint on the broadly worded basis that the evidence was insufficient to show that it had committed any discriminatory or willful and malicious act. The town did not request a directed verdict on count two of the complaint. LaMonica filed motions as to count one and count two, both of which substantially tracked the broad wording set out in the town's motion. The only argument made to the judge at a sidebar conference on the motions pertained to count four of Dalrymple's complaint, charging LaMonica, in his individual capacity, with discrimination and unlawful retaliation. The judge denied the motions. Neither the town nor LaMonica (individually or in his official capacity) renewed their motions for a directed verdict at the close of all the evidence. However, the town and LaMonica, in his official capacity, filed a motion for judgment notwithstanding the verdict, arguing that Dalrymple had failed to rebut their evidence showing that her termination was based upon legitimate rather than discriminatory reasons and that her proof of unlawful retaliation was insufficient.

On appeal, the defendants are more specific. They argue that Dalrymple's discrimination claim fails because she failed to show that she was performing her duties "at an acceptable level," *Blare* v. *Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 441 (1995), and, as to pretext, that her male colleagues were treated differently. See *Matthews* v. *Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 129-130 (1997). They contend that Dalrymple's claim of unlawful retaliation fails because it is based on circumstantial rather than direct evidence.[9]

Even assuming that the defendants' broadly worded motions

---

[9]On this point the defendants argue that the "cases seem to suggest . . . that *direct* evidence is necessary" (emphasis in original) and cite *Tate* v. *Department of Mental Health,* 419 Mass. 356, 365 (1995); *MacCormack* v. *Boston Edison Co.,* 423 Mass. 652, 661-662 (1996); *Melnychenko* v. *84*

for a directed verdict filed at the close of Dalrymple's case put before the judge the arguments now made on appeal, but see *Bonofiglio* v. *Commercial Union Ins. Co.*, 411 Mass. 31, 34-35 (1991) (discussing importance of specificity required by Mass. R.Civ.P. 50[a], 365 Mass. 814 [1974]), we do not consider them. See *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 8-9 (1983), stating that where, as here, the defendant's evidence was not brief and inconsequential, the failure to renew a motion for a directed verdict results in a waiver of the right to appeal from the denial of the motion, as well as a waiver of the right to appeal from the denial of the motion for judgment notwithstanding the verdict.[10]

5. *Jury confusion.* The defendants argue that the jury's verdict was the result of confusion brought about by the evidence concerning Dalrymple's prior MCAD complaints, her appeal to the commission, and the 1991 temporary restraining order she obtained against the defendants. The claim is disingenuous. The transcript shows that it was the defendants who insisted upon informing the jury about the MCAD complaints and appeal to the commission and that the judge did not allow the jury to know about the restraining order against the defendants. See note 8, *supra.*

6. *Remittitur.* In addition to their motion for judgment notwithstanding the verdict, the defendants also sought remittitur or a new trial. See Mass.R.Civ.P. 59(a), 365 Mass. 827 (1974) ("A new trial shall not be granted solely on the ground that the damages are excessive until the prevailing party has first been given an opportunity to remit so much thereof as the court adjudges is excessive"). The judge denied the motion.[11]

---

*Lumber Co.*, 424 Mass. 285, 291-295 (1997); *Bain* v. *Springfield*, 424 Mass. at 765; *Prader* v. *Leading Edge Prod., Inc.*, 39 Mass. App. Ct. 616, 619 (1996). For reasons discussed *infra*, we need not comment upon the defendants' reading of these cases.

[10]The defendants make no argument that the judge erroneously denied their motion for a new trial brought on the ground that the verdict was against the weight of the evidence. Compare *Bolton* v. *Massachusetts Bay Transp. Authy.*, 32 Mass. App. Ct. 654, 657, 658 (1992), where the defendant failed to move for a directed verdict at the close of the plaintiff's case but the sufficiency of the evidence was considered on the basis of the defendant's request for a new trial on the stated ground that the verdict was against the weight of the evidence.

[11]The judge endorsed the motion: "After hearing, motion is denied as there was sufficient evidence to justify the jury's award for reasons I stated on the

On appeal, the defendants argue that the award must be greatly reduced because it "shocks the conscience."

In arguing that Dalrymple's compensatory damage award, $275,000, is excessive, the defendants engage in a three-step process: first, they recite the facts in the light most favorable to them and dispute the evidence showing that their actions caused Dalrymple to sustain a financial loss of about $75,000; second, they read *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 826 n.17 (1997), as holding that compensatory damage awards based on facts comparable to those therein discussed, *id.* at 824-826, should fall within the range of somewhere between $15,000 to $50,000; and third, they conclude that because the evidence, as they recite it, showed that Dalrymple experienced far˙less emotional distress than that endured by the plaintiff in *Labonte*, the compensatory damage award cannot stand.

As discussed throughout this opinion, all the defendants' arguments that might have had some relevance to the question of Dalrymple's actual financial loss of $75,000 have failed.[12] We proceed, therefore, on the basis that the compensatory damage award was in large measure, $200,000, for emotional distress.

Although we do not have the benefit of the judge's reasons for concluding that the evidence was sufficient to justify the jury's award, see note 11, *supra*, his direct reference to *Labonte* in his instructions to the jury refutes any intimation that he was unfamiliar with applicable and controlling principles on the question of compensatory damages.[13] He could have concluded, as do we, that there is nothing in *Labonte*, 424 Mass. at 826 n.17, which *required* that damages attributable to emotional distress be capped at $50,000 and that, on the evidence

---

record." The defendants have not furnished us with the recorded reasons referred to by the judge. Although Dalrymple designated the transcript of the hearing for inclusion in the record appendix, the defendants failed to comply with her request. See Mass.R.A.P. 18(b), as amended, 417 Mass. 1602 (1994). She did not thereafter exercise the options available to her under Mass.R.A.P. 8(b), as amended, 430 Mass. 1601 (1999).

[12]The defendants weave into this argument the claim that the excessive nature of the award was exacerbated by the judge's failure to instruct the jury correctly on the issue of mitigation of damages. As previously discussed, however, the defendants made no objection to the jury instructions.

[13]It has not escaped our attention that the defendants did not cite any of the controlling cases on damages in either their requests for jury instructions or their postjudgment motions seeking relief from the award.

presented, Dalrymple's distress was qualitatively different from that described in *Labonte* and more comparable to that experienced by the plaintiff in *Powers* v. *H.B. Smith Co.*, 42 Mass. App. Ct. 657, 658-659, 665 (1997) (evidence did not require further reduction of an already remitted award of damages for emotional distress from $750,000 to $350,000).[14] On the evidence presented, we conclude that we have no basis for disturbing the judge's ruling denying remittitur on the question of the amount of the compensatory damage award.

We turn next to the jury's award of $300,000 in punitive damages. On this point, the defendants' argument is a simple assertion, made in three sentences, that because they did nothing wrong, punitive damages should not have been awarded.

The judge's instructions tracked the directives set out in *Labonte*. See also *BMW of N. America, Inc.* v. *Gore*, 517 U.S. 559, 575-583 (1996). The enormity of the defendants' actions is obvious: those charged with the public duty to enforce the law equally were shown to have deliberately violated it for reprehensible reasons. See *id.* at 575-580. Additionally, the punitive damage award of $300,000 was not unreasonable or excessive in respect to its ratio to the actual harm ($275,000) found by the jury. See *id.* at 580-583.

Because the defendants have failed to sustain their burden of showing that the judge abused his discretion or otherwise committed an error of law, we have no basis for disturbing his denial of the defendants' request for remittitur.

7. *LaMonica's liability*. There is a final argument by LaMonica. He claims that he cannot be held individually liable for any of the acts he committed in his capacity as chief of the Winthrop police department. The argument fails for those reasons most recently discussed in *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 492-495 (2000).

8. *Postjudgment interest, fees, and costs*. Dalrymple's request

---

[14]Dalrymple presented evidence to show that she, a life-long resident of Winthrop and known to the community, was proud of the fact that she was the first woman to be appointed a police officer for the town, that she felt a responsibility to set an example, that when she was fired from the force for conduct unbecoming an officer, she felt humiliated and went into a depression, that she was so ashamed that she was reluctant to leave her home to go out into the community where she previously had been active and visible, that she had such concern about the effect of the cited reason for her discharge upon her family that she could not sleep, and that she had become angry and bitter, finding safety and solace only in her religious beliefs.

for postjudgment interest is denied. See *Boston* v. *Massachusetts Commn. Against Discrimination*, 39 Mass. App. Ct. 234, 245-246 (1995). Because we are not prepared to conclude that the town's appeal was immaterial, intended for delay, or not advanced in good faith, her request for damages is also denied. Dalrymple is, however, entitled to reasonable attorney's fees and costs in connection with the defendants' appeal, see G. L. c. 151B, § 9, in an amount to be determined in accordance with the procedure set out in *Yorke Mgmt.* v. *Castro*, 406 Mass. 17, 20 (1989).

*Judgment affirmed.*