SARA CICCARELLI vs. SCHOOL DEPARTMENT OF LOWELL.

No. 06-P-1537.

Middlesex. October 18, 2007. - December 7, 2007.

Present: McHUGH, KAFKER, & GRAINGER, JJ.

*Employment,* Retaliation. *School and School Committee,* Superintendent of schools. *Witness. Damages,* Punitive.

Evidence in a civil action supported the jury's finding that the the defendant city school department retaliated against the plaintiff, a provisional teacher, in violation of G. L. c. 151B, § 4(4), by suddenly and unexpectedly failing to reappoint her, four days after her name appeared on a witness list of another teacher who had filed a complaint with the Massachusetts Commission Against Discrimination, where the deputy superintendent of the school department had authorization to take such adverse employment action against the plaintiff [791-793], who was disadvantaged regardless of an offer of reemployment one month after the original decision [793]; and where the jury properly could have inferred that the deputy superintendent knew of the plaintiff's protected activity in appearing on the other teacher's witness list and denied her reemployment because of it [793-794], the issue of knowledge being one that did not require a special jury question [794-795].

In a retaliation case brought by a provisional teacher under G. L. c. 151B, § 4(4), alleging that the defendant city school department failed to rehire her because her name appeared on another teacher's witness list in a discrimination action against the city, the jury properly considered limited evidence of that discrimination action in awarding punitive damages, where the evidence provided the necessary context for the plaintiff's claim. [795]

In a retaliation case, sufficient evidence existed to place the issue of punitive damages before the jury, where the failure of the deputy superintendent of the defendant city school department to rehire the plaintiff after her name appeared on a witness list in another discrimination action against the city constituted outrageous behavior on the part of a high-ranking public official in charge of the education of a city's children, reflecting either an evil motive (to punish or pressure the plaintiff concerning the protected activity of testifying) or reckless indifference to the rights of others, thereby requiring condemnation and deterrence [795-797]; moreover, the award was not excessive as a matter of law, in light of the degree of reprehensibility of the conduct at issue, the ratio of punitive damages to the actual harm to the plaintiff, and the criminal penalties that could be imposed for comparable misconduct [797-799].

This court declined to consider issues that were not properly preserved on appeal. [799]

This court affirmed a Superior Court judge's award of attorney's fees to the prevailing party in a civil action and allowed that party to file an application for appellate attorney's fees and costs. [799]

CIVIL ACTION commenced in the Superior Court Department on August 3, 2000.

The case was tried before *Paul A. Chernoff,* J., and motions for judgment notwithstanding the verdict, for a new trial, and for remittitur were heard by him.

*Kimberly A. McMahon* for the defendant.

*Justine H. Brousseau* (*Nina Joan Kimball* with her) for the plaintiff.

KAFKER, J. Just a few days after she appeared on a witness list of another teacher who had filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) against the city of Lowell (city) school department for sex discrimination, the plaintiff, Sara Ciccarelli, unexpectedly learned that she would not be reappointed as a provisional teacher. Ciccarelli then brought this action against the city for retaliation pursuant to G. L. c. 151B, § 4(4). The jury found for Ciccarelli and awarded her $1,800 for lost pay, $8,200 for emotional distress, and $50,000 in punitive damages. The trial judge awarded Ciccarelli $102,252.54 in attorney's fees. On appeal, the city claims that there was insufficient evidence to support the jury's finding of retaliation and the award of emotional distress and punitive damages. The city further maintains that Ciccarelli's counsel made improper references to an uncalled witness in her closing argument. We conclude that the evidence supports the jury's finding of retaliation and its award of punitive damages. We also conclude that the city failed to preserve the issues of the uncalled witness references and emotional distress damages, and we affirm the judgment.

*Background.* The jury were warranted in finding the following facts. Ciccarelli began teaching Spanish at Lowell High School (school) in the 1995-1996 school year under a provisional teaching certificate. This teaching experience was part of a five-year program to gain advanced provisional certification. The program was supervised by Mary Ann Simensen, the coordina-

tor for staff development programs. In addition to the teaching experience, the certification program required Ciccarelli to fulfil seven teaching competencies[1] and complete fifteen hours of coursework before the end of the five-year period.

After receiving the highest ratings in her evaluations,[2] Ciccarelli was rehired for the 1996-1997 academic year. While Ciccarelli was completing her second year of teaching, another school employee, Patricia Kealy, filed a sexual discrimination complaint with the MCAD against the city. In the spring of 1997, Ciccarelli agreed to be a witness on Kealy's behalf. In March of 1997, the headmaster of the school, William Samaras, recommended Ciccarelli for permanent hire and reappointment for the 1997-1998 school year. In a letter dated June 18, 1997, the superintendent, George Tsapatsaris, also stated the present intention to rehire her for the following school year. Shortly after that letter, the deputy superintendent of personnel, Dr. Helen Flanagan, reported that Ciccarelli successfully completed a supervised, mentored internship and fulfilled all seven teaching competencies. Flanagan's job responsibilities included the hiring, recruitment, and professional development of the city's teachers. As part of these responsibilities, she would issue "halts" and provide clearance for the rehiring of provisional teachers.

On Thursday, July 31, 1997, the city's attorney first received a list of potential witnesses in the Kealy case. Of the names on the list, Ciccarelli was the only provisional teacher. Four days later, Flanagan called Ciccarelli to discuss her lack of coursework toward advanced certification. This telephone call was the first criticism of Ciccarelli's progress in her two years of employment at the school. Even though Ciccarelli still had three years to complete these courses, Flanagan expressed concern about Ciccarelli's ability to do so. Ciccarelli continued to stress her intentions to take the courses. However, Flanagan refused to accept these assurances. Flanagan told Ciccarelli that there was "no possibility of [her] coming back," unless she took the

---

[1]Those competencies are subject area knowledge, communication skills, instructional practice, evaluation, problem solving, equity, and professionalism.

[2]Ciccarelli was evaluated in the fall and spring of the 1995-1996 school year. On both of those evaluations, she received the highest score of "S": "meeting or exceeding standards of professional performance."

courses immediately. Flanagan ended the call by asking, "How can I rehire you, can you answer that?"

After that phone call, Ciccarelli consulted an attorney in order to be rehired. On August 13, 1997, her attorney sent a letter to Flanagan requesting Ciccarelli's reinstatement and pointing to the "more than coincidental" fact that her employment was terminated just days after the city learned of her status as a witness in the Kealy case. This request was unsuccessful, as Flanagan continued to insist that by delaying the coursework, Ciccarelli was not working in good faith.

Based on these conversations with Flanagan, Ciccarelli did not attend the teacher orientation on August 26, 1997. School began the following day. The chairperson of the foreign language department, Priscilla Sicard, noticed that Ciccarelli was absent and asked the headmaster, Samaras, if he knew the reason for her absence. Samaras responded, "She's not coming back." As he later testified at trial, Samaras was aware that Ciccarelli was not returning for some time prior to the first day of school.

On August 29, 1997, Ciccarelli wrote a letter to Flanagan in a final attempt to get her job back. In the letter, Ciccarelli stressed her progress toward certification and her continued intention to complete the required coursework before the five-year period expired. This letter was also unsuccessful.

Two weeks into the 1997-1998 school year, the city still could not find anyone to fill Ciccarelli's position. Ciccarelli finally received an offer of reinstatement on September 9, 1997, the day before she was scheduled to testify in the Kealy case. For Ciccarelli, the job offer came too late, as the school year had already started without her.

The day after receiving the offer to return to work, Ciccarelli testified before the MCAD in the Kealy case. In the present case, Ciccarelli and Kealy both testified that Flanagan sat at the counsel table next to the city's attorney during that earlier testimony.

Ciccarelli initiated this action by lodging a complaint with the MCAD, which she then removed to Superior Court, alleging that the failure to rehire her was retaliation in violation of G. L. c. 151B, § 4(4). The case went to trial, where Flanagan continued to insist that Ciccarelli was not rehired because of her lack of progress, and that she was not even aware of Ciccarel-

li's testimony in the Kealy case until she was deposed for this trial in 2002. However, the jury agreed with Ciccarelli and awarded her damages.

The city promptly moved for judgment notwithstanding the verdict, a new trial, and remittitur. All three of these motions were denied by the trial judge. The judge allowed Ciccarelli's motion for attorney's fees, and final judgment entered against the city in the amount of $162,252.54. The city thereafter filed a timely appeal.

1. *Standard of review.* When reviewing the denial of a motion for judgment notwithstanding the verdict, the evidence is viewed in the light most favorable to the plaintiff, and all evidence favorable to the city is disregarded. *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.),* 427 Mass. 1, 16 (1998). *Christopher* v. *Father's Huddle Café, Inc.,* 57 Mass. App. Ct. 217, 219 (2003).

A trial judge may also set aside a jury verdict and grant a motion for new trial if the weight of the evidence suggests that the verdict was based on bias, misunderstanding, or prejudice. *W. Oliver Trip Co.* v. *American Hoechst Corp.,* 34 Mass. App. Ct. 744, 748 (1993). A judge's decision not to grant such a motion, however, will be overturned only upon an abuse of discretion. *Gath* v. *M/A-COM, Inc.,* 440 Mass. 482, 492 (2003).

2. *Retaliation claim.* An employer may not "discharge, expel or otherwise discriminate against any person . . . because he has filed a complaint, testified or assisted in any proceeding under section five." G. L. c. 151B, § 4(4), inserted by St. 1946, c. 368, § 4. A retaliation claim under c. 151B must fulfill three elements: (1) the employee engaged in a protected activity; (2) the employee faced an adverse employment consequence; and (3) the protected activity caused the adverse employment action. *Mole* v. *University of Mass.,* 442 Mass. 582, 591-592 (2004). Because it is undisputed that Ciccarelli's testimony in Kealy's sexual discrimination case was a protected activity, the city only appeals the sufficiency of the evidence on the latter two elements.

First, the city argues that Ciccarelli cannot demonstrate an adverse employment action because only school principals have the authority to hire and fire teachers, and the deputy superintendent, as a matter of law and fact, could not decide whether to rehire Ciccarelli. The Massachusetts Education Reform Act of

1993 (MERA) defines the authority to hire teachers as follows: "Principals employed under this section shall be responsible, consistent with district personnel policies and budgetary restrictions and *subject to the approval of the superintendent*, for hiring all teachers . . ." (emphasis added). G. L. c. 71, § 59B, as appearing in St. 1993, c. 71, § 53. Similarly, in the area of dismissal or demotion, MERA provides: "A principal may dismiss or demote any teacher or other person assigned full-time to the school, *subject to the review and approval of the superintendent*" (emphasis added). G. L. c. 71, § 42, as appearing in St. 1993, c. 71, § 44.

We interpret the statute to provide a significant role to superintendents in the hiring and firing process. Their approval is required for both. Although the ultimate responsibility regarding such approval resides by statute with the superintendents themselves, they may authorize their deputies to take actions on their behalf in carrying out these statutory responsibilities. Furthermore, the school department may be held responsible for such actions. See *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. 156, 167 (1987). "It is clear that the Legislature intended that an employer be liable for discrimination committed by those on whom it confers authority." *Id.* at 165.

The jury here could reasonably conclude that Flanagan had authorization to act in the instant case, and that the exercise of that authority resulted in the decision not to rehire Ciccarelli. As to authorization, Flanagan herself testified: "My job duties were the hiring, the recruitment, . . . the evaluation, professional development, everything associated with teachers and paraprofessionals." According to Samaras, the school headmaster, Flanagan would issue "halts" if a provisional teacher would not be allowed to come back. Flanagan also stated to Ciccarelli, "How can *I* rehire you" (emphasis added). Additionally, Samaras testified to Flanagan's significant role in the hiring and rehiring process, as did Sicard, the chairperson of the foreign languages department. The superintendent did not testify. In sum, there was sufficient evidence of Flanagan's authority to act with regard to the rehiring of provisional teachers.

There was also ample evidence for the jury to conclude that

approval for the rehiring of Ciccarelli had been denied by Flanagan and that Ciccarelli had not simply resigned. Flanagan's remarks to Ciccarelli — "There's no possibility of [you] coming back" unless the coursework was begun immediately, and "How can I rehire you" — can be reasonably interpreted as statements indicating that she was not eligible for reappointment. Ciccarelli's letters, all based on the explicit assumption that she had been discharged, were never contradicted, and her attempts to get her job back prior to the start of the school year were not successful. Headmaster Samaras understood that Ciccarelli was not returning and that she had not obtained approval for rehire. The decision not to rehire was an adverse employment action that disadvantaged Ciccarelli. See *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 662-663 (1996).

The city argues nonetheless that there was no adverse employment action because Ciccarelli rejected her subsequent offer of reinstatement. While the rejected offer of reemployment may terminate Ciccarelli's lost-pay damage calculation, it does not eliminate liability for the original decision not to rehire her. See *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 389-390 (1988) (employee's failure to mitigate through reinstatement terminated economic damages based on lost pay, but did not release employer from all liability). Here, the city did not offer Ciccarelli her job back until approximately one month later. This offer came too late for the city to claim that Ciccarelli was not materially disadvantaged. Ciccarelli has therefore presented sufficient evidence for a reasonable jury to conclude that she suffered an adverse employment action.

Second, assuming there was an adverse employment action, the city argues that the evidence was insufficient to demonstrate that the adverse action (the decision not to rehire Ciccarelli) was caused by her protected activity (her appearance on the witness list in the Kealy case). The mere fact that an employee engaged in a protected activity before facing adverse consequences "is not sufficient to make out a causal link." *MacCormack* v. *Boston Edison Co.*, 423 Mass. at 662 n.11. However, a jury may infer such causation if the adverse action occurs immediately after the employer becomes aware of the protected action. See *Mole* v. *University of Mass.*, 442 Mass. at 592.

"Close temporal proximity between the protected activity and the adverse employment action permits an inference of the causal nexus necessary for a finding of retaliation." *Ritchie* v. *Department of State Police*, 60 Mass. App. Ct. 655, 666 (2004), quoting from Cooney, Understanding and Preventing Workplace Retaliation, 88 Mass. L. Rev. 3, 13 (2003).

In the instant case, Ciccarelli's rehire status changed suddenly and unexpectedly four days after her name appeared on the witness list in the Kealy case. Flanagan, a high-ranking school district official, was actively involved in both matters. Although the witness list letter was sent to counsel and not directly to Flanagan, the jury could have properly inferred that Flanagan had been informed of the list before she called Ciccarelli, because Flanagan was participating in the preparation of the defense in the Kealy case.[3] She certainly knew about Ciccarelli's appearance on the witness list on August 13, 1997, when she received the letter from Ciccarelli's counsel. Flanagan's credibility in the instant case was also put into question when she attempted to minimize her role in the Kealy case by claiming that she knew nothing about Ciccarelli's testimony until her own deposition in 2002. The jury could have reasonably interpreted all of this evidence to establish that Flanagan knew of Ciccarelli's protected activity and denied her reemployment because of it.

Even though the jury could reasonably make these inferences, the city also argues that the trial judge erred by denying its request for a special verdict question regarding knowledge of the protected activity. No such special verdict question is required as the issue of knowledge was directly and correctly addressed in the jury instructions themselves.

The judge here instructed the jury as follows:

"The plaintiff must prove that the person responsible for taking the complained of action knew at the time that the plaintiff had exercised or engaged in protected activity . . . . If the jury finds that the person acting on behalf of the defendant took an adverse employment action against

---

[3]Flanagan's presence at the defense counsel table on September 10, 1997, confirms the significance of her role in the Kealy matter.

the plaintiff and knew at the time of the protected activity, then the jury must go on to determine the question of causation."

In fact, the judge went further, explaining to the jury why he did not include a separate special verdict question on knowledge:

"Did Dr. Flanagan have actual knowledge of the plaintiff's participation in protected activity at the time she rendered the employment decision in question. I didn't feel I needed to put that question in because that is really a part of retaliation. In order for the jury to find there was retaliation they would have to find that the person who took the employment action knew of the participation in the protected activity at the time that they took the action. So I didn't put it in there."

In sum, the judge's instructions properly addressed the issue of knowledge. No special verdict question singling out this issue was required for the reasons explained by the trial judge himself.[4]

3. *Punitive damages.* With regard to punitive damages, the city first argues that evidence of Kealy's discrimination case was irrelevant and prejudicial, and thus improperly considered by the jury in awarding punitive damages. In order for evidence to be relevant, it must have some tendency to prove a fact that is material in this case. *Harris-Lewis* v. *Mudge*, 60 Mass. App. Ct. 480, 485 (2004). In this case, the limited evidence of Kealy's discrimination suit that was introduced provided necessary context for Ciccarelli's retaliation claim. There was also no objection to most, if not all, of this evidence. The evidence was therefore properly considered.

The city's second argument is that the evidence was insufficient to support an award of punitive damages. Chapter 151B provides for the award of punitive damages in appropriate cases. Such damages "may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Dartt* v. *Browning-Ferris Indus., Inc., (Mass.)*, 427 Mass. at 17a, quoting from Restatement

---

[4]The city's argument that Ciccarelli must prove that she reasonably and in good faith believed that the city retaliated against her is erroneous.

(Second) of Torts § 908(2) (1979). See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 119 (2000); *Clifton* v. *Massachusetts Bay Transp. Authy.*, 445 Mass 611, 623 (2005); *Smith* v. *Bell Atl.*, 63 Mass. App. Ct. 702, 721 (2005). Punitive damages are appropriate when the defendant's conduct "warrants condemnation and deterrence." *Bain* v. *Springfield*, 424 Mass. 758, 767 (1997).

We conclude that there was sufficient evidence to place the issue of punitive damages before the jury. See *id.* at 764-766. See also *Handrahan* v. *Red Roof Inns, Inc.*, 43 Mass. App. Ct. 13, 23 (1997) ("Although the evidence of discrimination was less than overwhelming, we agree with the trial judge that it was sufficient to warrant submitting the issue of punitive damages to the jury"). Compare *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. at 17a (since there was no admissible evidence that defendant's conduct was outrageous in any respect, there was no jury issue on punitive damages); *Smith* v. *Bell Atl.*, *supra* at 722 (punitive damages issue properly withheld from jury as "the company's behavior, while actionable, was not so egregious as to warrant the condemnation and enhanced deterrence that underlie the imposition of punitive damages"). The jury could have reasonably concluded that as soon as Flanagan learned that Ciccarelli was on Kealy's witness list, Flanagan decided not to approve Ciccarelli's rehiring and fabricated an excuse for doing so as punishment for Ciccarelli's agreeing to testify for Kealy at the MCAD hearing. Flanagan took this action in her capacity as a high-ranking public official. "[D]eliberate violations of G. L. c. 151B, by 'those charged with the public duty to enforce the law equally' present a heightened degree of reprehensibility." *Clifton* v. *Massachusetts Bay Transp. Authy.*, 445 Mass at 623-624, quoting from *Dalrymple* v. *Winthrop*, 50 Mass. App. Ct. 611, 621 (2000).[5]

Although the quick correction of the retaliatory action by the city in offering to reinstate Ciccarelli would ordinarily weigh

---

[5]In *Dalrymple*, "those charged with the public duty to enforce the law equally were shown to have deliberately violated it for reprehensible reasons." 50 Mass. App. Ct. at 621. That standard was extended from police officers in *Dalrymple* to public entities more generally when the court, in *Clifton*, applied that standard to the Massachusetts Bay Transportation Authority. See *Clifton*, 445 Mass. at 623-624.

heavily against a finding of punitive damages, the timing of that decision in this case was suspicious — she was offered reinstatement the day before Kealy's MCAD hearing, in which Ciccarelli was scheduled to testify. The jury could therefore infer that the offer was meant to influence that testimony.

Flanagan's testimony that she did not know about Ciccarelli's agreement to testify until her own deposition in 2002 was contradicted by the letter to her dated August 13, 1997, from Ciccarelli's attorney, and her presence at defense counsel's table when Ciccarelli testified at Kealy's MCAD hearing on September 10, 1997. Therefore, the jury could have interpreted Flanagan's testimony as false and designed to cover up her actions in both matters. "[A] punitive damages award may be 'justified not only by defendant's actions on [the date in question] but also by their subsequent behavior.' " *Davis* v. *Rennie*, 264 F.3d 86, 115 (1st Cir. 2001), cert. denied, 535 U.S. 1053 (2002), quoting from *Hall* v. *Ochs*, 817 F.2d 920, 927 (1st Cir. 1987). See *Hall*, 817 F.2d at 928 ("a factfinder might infer that the stark clash [of evidence at trial] could not have resulted from innocent misrecollection and that its *intentional* quality intensified any need the jury may have found for punishment and deterrence").

In sum, the jury could conclude from this evidence that such behavior by a high-ranking public official in charge of education of a city's children was outrageous and reflected either an evil motive or reckless indifference to the rights of others, thereby requiring condemnation and deterrence.

Our analysis, however, does not end with whether the question of punitive damages was properly submitted to the jury. There is no statutory cap on the amount of punitive damages available in a retaliation claim. G. L. c. 151B, § 9. See *Clifton* v. *Massachusetts Bay Transp. Authy.*, 445 Mass. at 624 ("given that no limiting language appears in the statute, and that the statute contains specific provisions . . . for discrimination . . . it is fair to infer that the Legislature intends to punish employers who discriminate with no restrictions as to the type of discrimination that occurred here"). "Where, as here, there is no cap on punitive damages, a judge or an appellate court must scrutinize the relationship between actual damages and the award of punitive damages." *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 827 (1997). We analyze

three main factors to determine whether the award of punitive damages is excessive: " 'the degree of reprehensibility of the defendant's conduct,' the ratio of the punitive damage award to the 'actual harm inflicted on the plaintiff,' [and] a comparison of 'the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct.' " *Id.* at 826-827, quoting from *BMW of N. America v. Gore*, 517 U.S. 559, 575, 580, 583 (1996).

First, we examine the degree of reprehensibility of the city's conduct. As stated above, the conduct the jury reasonably found to be outrageous was committed by a public official charged with educating the city's children. See *Clifton v. Massachusetts Bay Transp. Authy.*, 445 Mass. at 623-624. The jury also could have found that the conduct involved punishment or pressure placed on a witness for testifying, a matter of grave concern to the integrity of the legal process. Furthermore, Flanagan's subsequent testimony denying her knowledge in 1997 could have been interpreted as lying to cover up her wrongdoing. See *Hall v. Ochs*, 817 F.2d at 928. See also *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 486 (7th Cir. 2003), cert. denied, 540 U.S. 1182 (2004) ("the evidence clearly supported a finding that [the defendant] engaged in a cover-up in flagrant violation of Title VII, thus warranting a large punitive damages award"). In considering the ratio of the punitive damages awarded and the actual harm to Ciccarelli, we consider that she received $1,800 for lost pay, $8,200 for emotional distress, and $50,000 for punitive damages. Thus the ratio of punitive damages to actual harm was five to one. See *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of ratios in range of deterrence and retribution, than awards with 500 to 1 or [as in case before the United States Supreme Court] of 145 to 1"); *Bain v. Springfield*, 424 Mass. at 769 ("We do not think, however, that an award of $100,000, even in the absence of any compensatory harm, would necessarily exceed the norms of rationality"); *Borne v. Haverhill Golf & Country Club, Inc.*, 58 Mass. App. Ct. 306, 322-323 (2003).

The third prong of the analysis also supports upholding the

jury verdict. Punishing or pressuring a witness regarding testifying in a legal proceeding merits significant penalties. See generally G. L. c. 268, § 13B (punishment of up to ten years in prison or fine of up to $5,000 for intimidation of witnesses in criminal proceedings). See 18 U.S.C. § 1512(b) (2000) (punishment of up to ten years' imprisonment and/or fine up to $250,000 for intimidating another with the intent to evade legal process or induce that person's absence from an official proceeding).

In sum, we conclude that the jury award of $50,000 in punitive damages was justified by the evidence and not excessive as matter of law.

4. *Uncalled witness mentioned in closing argument.* The city argues that Ciccarelli's counsel improperly referred to an uncalled witness, Simensen, in closing arguments. In order to raise an issue on appeal, a party must lodge a specific objection on the record. Mass.R.Civ.P. 46, 365 Mass. 811 (1974). At trial, the city neither objected to these remarks nor requested curative instructions. The issue was therefore not properly preserved.

5. *Emotional distress damages.* The city also failed to object to emotional distress damages at trial or in their posttrial motions. The issue of emotional distress damages therefore was not preserved. The city properly conceded this issue at oral argument.

6. *Attorney's fees.* The city does not challenge the amount of the attorney's fees. As we conclude that Ciccarelli is the prevailing party, we affirm the trial judge's award of attorney's fees. Ciccarelli has also requested an award of attorney's fees on appeal. General Laws c. 151B, § 9, provides for such an award. See *Salvi* v. *Suffolk County Sheriff's Dept.*, 67 Mass. App. Ct. 596, 610 (2006). In accordance with the procedure outlined in *Fabre* v. *Walton*, 441 Mass. 9 (2004), Ciccarelli may file her application for appellate attorney's fees and costs within fourteen days of the date of rescript. The city shall then have fourteen days within which to respond. See *Salvi, supra* at 611.

*Conclusion.* For the reasons stated above, there was no error in the order denying the city's motions for judgment notwithstanding the verdict, new trial, and remittitur. The judgment is affirmed.

*So ordered.*