Hines, Geraldine S., J.
Introduction
The plaintiff, Deborah Kiely (“Kiely”), brought this action under G.L.c. 151B, asserting claims for gender discrimination and retaliation against the defendant, Teradyne, Inc. (“Teradyne”), her former employer.[1] Kiely alleges that Teradyne discriminated against her on the basis of her gender by targeting her for lay-off in November 2006 and refusing to rehire her for one of two positions that became available after the lay-off. She also alleges that Teradyne retaliated against her for engaging in protected activity, her MCAD challenge to the lay-off, when it failed to rehire her. These claims were tried to a jury in October and November 2011. After an eight-day trial, the jury returned a verdict for Teradyne on the discrimination claim and for Kiely on the retaliation claim. The jury awarded Kiely no compensatory damages and $1,100,000 in punitive damages.
The matter now before the court is Teradyne’s motion for judgment notwithstanding the verdict under Mass.R.Civ.P. 50(b) on the ground that Kiely failed in her burden to prove the essential elements of her retaliation claim: (1) that Teradyne’s decision-maker for the re-hiring decision had knowledge of her MCAD complaint; and (2) that Teradyne’s decision-maker failed to rehire her because of her protected conduct. In the alternative, Teradyne argues that even if the retaliation verdict is allowed to stand, the punitive damages award must be set aside. Teradyne asserts that Kiely failed to prove conduct so “outrageous and egregious” as to justify an award of punitive damages. Kiely opposes the motion, rebutting both of Teradyne’s arguments with vigor and substance. For the reasons explained below, the motion for judgment notwithstanding the verdict is DENIED and the motion to vacate the punitive damages award is ALLOWED.
BACKGROUND
The juiy could have based its verdict on the following facts. Kiely worked at Teradyne for more than twenty years, beginning her employment in 1982. For most of that time, she worked as a test technician in the Global Customer Services (“GCS”) department which was responsible for repairing computer “boards" returned to Teradyne from its customers all over the world. In 2004, Kiely was promoted to Group Leader, a position which involved less repair work and more administrative duties. Kiely performed well in her job but she encountered interpersonal difficulties with her colleagues, most of whom were male.[2] In the years between 2000 and 2006, the ranks of the test technicians shrank as a result of layoffs from approximately thirfy-one employees to three employees. Kiely survived every round of layoffs until November 2006 when she was part of the last group of three test technicians to be laid off effective December 2, 2006. At that time, Teradyne laid off Kiely and the two remaining male technicians, Dennis Hodgdon and Steve Senecal. Teradyne implemented these layoffs to accommodate its plan to move its repair operation to Costa Rica and the Philippines. Kiely received her lay-off notice on November 2, 2006 and filed her gender discrimination charge in the MCAD on November 21, 2006.
Shortly after these layoffs, two test technician positions opened up in the Assembly Test Division (“ATD”), a different department from GCS where Kiely had been working. Jay Fitton, a manager in that department, was designated to make the hiring decisions. During the trial, whether Fitton was aware of Kiely’s MCAD charge and whether Fitton passed over Kiely because of her protected activity were hotly contested issues. Teradyne did not post these positions in accordance with its hiring policy. Instead, Teradyne opted to consider rehiring only Kiely, Hodgdon and Senecal. At that time, Hodgdon and Senecal were working as test technicians. Kiely was an experienced and competent test technician but she was then serving as Group Leader. None of the three was offered an interview or told that they were being considered for the newly available positions.
Bill Bums, the Human Resources Manager, became aware of Kiely’s MCAD charge and that she was being considered for one of the test technician positions in ATD. He instructed Susan Blair, the HR manager for ATD, to instruct Jay Fitton to document the hiring decision insofar as it related to Kiely. Fitton testified, without contradiction, that Human Resources never explained the reason why he was being told to document the hiring process .Nor was he ever told that Kiely had filed a discrimination charge at the MCAD.
As part of the hiring process, Fitton spoke to Norris Clare and Hal Pierce, both of whom were Teradyne managers, to assess the technical skills of the three candidates. Fitton did not suggest any preference as to who should be hired, inquiring only about which of the three were the superior test technicians. Clare and Pierce provided glowing reviews of Hodgdon’s and Senecal’s technical skills, but neither could not speak about Kiely. Instead, Clare directed Fitton to Pierce who in turn directed him to Charles Trapani. Trapani had supervised Kiely for a number of years earlier in her tenure at Teradyne and presumably knew her best. Without speaking to Trapani, however, Fitton decided that he would hire Hodgdon and Senecal for the positions.[3] At no time prior to the hiring decision did Fitton speak to Kiely about her qualifications. On December 4, 2006, Fitton wrote a memorandum explaining his decision not to hire Kiely for either of the positions. He justified his decision to rehire Hodgdon and Senecal on the ground that they possessed supe *543 rior qualifications as test technicians. Hodgdon was rehired on December 5, 2006, and Senecal was rehired in mid-Januaiy of 2007.
In response to Kiely’s contention at trial that Fitton had not sufficiently vetted Kiely’s qualifications, Fitton claimed that he had been under time-pressure to hire test technicians. And, based on his brief investigation, Fitton stated that he discovered that Kiely had most recently worked as a group leader and had not been doing technician work for several years. Teradyne also attempted to show that the project to which the new hires would be assigned would need the test technicians in place without delay. The jury could have rejected this explanation where the time imperative was never quite clearly explained by any Teradyne witness.
DISCUSSION
A. Standard for Motion under Mass.R.Civ.P. 50(b)
The standard for a motion under Mass.R.Civ.P. 50(b) imposes an onerous burden on the moving party. The question before the court is “whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the nonmoving party.” Phelan v. May Dept. Stores Co., 443 Mass. 52, 55 (2004), quoting Tosti v. Ayik, 394 Mass. 482, 494 (1985) (internal quotations and citations omitted). Reasonable inferences “must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture.” Id. (citations omitted). The court does “not weigh the evidence or consider the credibility of witnesses” and “ignore[s] evidence that contradicts the testimony of the nonmoving parly.” Mercado v. Manny’s T.V. & Appliance, Inc., 77 Mass.App.Ct. 135, 138 (2010) (citations omitted). In other words, a court must sustain the verdict “if a plaintiff has presented any evidence from which the jury reasonably could have arrived at that verdict.” Labonte v. Hutchins & Wheeler, 424 Mass. 813, 821 (1999).
B. The Retaliation Verdict
To establish a prima facie case of retaliation, a plaintiff must show: “(1) that [she] engaged in protected conduct; (2) that [she] suffered some adverse action; and (3) that a causal connection links the protected conduct and the adverse action.” Poon v. Massachusetts Inst. of Tech., 74 Mass.App.Ct. 185, 199-200 (2009), citing MacCormack v. Boston Edison Co., 423 Mass. 652, 662 (1996). A retaliation claim is independent of a discrimination claim, and an employee need not prove discrimination to maintain a retaliation claim. Poon, 74 Mass.App.Ct. at 200. Instead, an employee is required to “show that he acted in good faith and in the reasonable belief of wrongful discrimination by his employer and that the employer’s desire to retaliate was a determinant of a resulting adverse action.” Id., citing Tate v. Department of Mental Health 419 Mass. 356, 364 (1995).
Teradyne argues that Kiely presented no evidence, direct or circumstantial, from which the jury reasonably could infer that Fitton knew of Kiely’s MCAD complaint against Teradyne. Teradyne relies on Fitton’s undisputed testimony that he was not told of the charge by the HR manager who asked him to document the hiring process and Clare’s and Pierce’s testimony that they were unaware of Kiely’s MCAD charge at they time they spoke to Fitton about Kiely, Hodgdon and Senecal.
Kiely vigorously contests Teradyne’s position, arguing that the evidence is “more than sufficient” to uphold the jury’s finding. Kiely makes two points in rejoinder: (1) that “Fitton never testified that he did not know” about the MCAD charge when he made his hiring decision; and (2) that Fitton’s knowledge is established by the directive to document the hiring process. Having heard all the evidence at trial, this characterization as “more than sufficient” perhaps overstates the weight of plaintiffs case on the knowledge issue. Nonetheless, upon viewing the evidence in the light most favorable to Kiely, circumstantial evidence exists from which the jury reasonably could infer that Fitton knew of Kiely’s MCAD charge against Teradyne. See Mole v. University of Mass., 442 Mass. 582, 593 (2004) (employee may use circumstantial evidence to show that an employer possesses knowledge of protected conduct and acts with retaliatory motive in taking adverse action).
Kiely’s first point is unavailing. It was her burden to establish knowledge and she cannot now credibly argue that she proved knowledge based on what a witness subject to cross examination did not say. As to the second point, Kiely argues that it is likely that HR also told Fitton why he was being asked to document the hiring process. In the alternative, she claims that the jury could infer that Trapani told Fitton of the charge because he acknowledged in his deposition testimony[4] that he learned of the MCAD charge “at or around the time” it was brought. This court agrees that the juiy could have inferred Fitton’s knowledge of Kiely’s protected conduct from Blair’s instruction to document only Kiely’s hiring process but not for the reasons suggested by Kiely. First, the documentation request was a departure from Teradyne’s usual custom and practice. The fact that Blair requested documentation only as to Kiely made it probable, not merely possible, that Teradyne was under pressure from some source to justify any adverse action that might occur respecting Kiely’s employment. Fitton was an experienced manager who likely understood the reason for this directive, especially where it came from Human Resources and it did not apply to either of the other prospective hires. On the other hand, Kiely’s argument that the juiy could infer that Trapani told Fitton of the MCAD complaint fails for two reasons. *544 First, that Trapani told Fitton of the MCAD charge cannot reasonably be inferred from Trapani’s deposition testimony that he learned of the charge “at or around the time” of the hiring decision; this prior inconsistent statement is simply too imprecise. Also, Kiely cannot use Trapani as both a sword and a shield. Her position at trial was that Fitton did not fairly evaluate her qualifications because he made the hiring decision before talking to Trapani, the person who knew Kiely best. Having taken that position at trial, Kiely cannot prove knowledge based on a conversation that likely occurred after the hiring decision.
The facts of this case on the knowledge issue are perilously close to those which compelled the court in Mole to hold that the plaintiff had failed to prove the requisite knowledge of protected conduct. Id. at 592-94. Mole counsels against speculation and directs that evidence establishing that a decision-maker “might have known” is not good enough. Although not compelling by any means, the directive to document the hiring process could have tipped the balance ever so slightly in the minds of the jurors who were instructed to determine if Fitton was aware of the MCAD charge at the time of his hiring decision.
2. Retaliatory Animus
Teradyne argues that Kiely failed to prove that Fitton harbored a retaliatory animus in failing to hire her for one of the test technician positions, anchoring this position to its contention that Kiely failed to prove Fitton’s knowledge of the MCAD charge. Kiely counters that the jury reasonably could infer a retaliatory animus from: (1) the instruction to document the hiring decision; (2) Fitton’s course of conduct, including the deviations from Teradyne’s policy; (4) the temporal proximity of the MCAD charge to the rehiring decision; and (5) the alleged retaliatory climate at Teradyne. Applying the standard as set forth in Phelan, 443 Mass. at 55, I conclude that, though it is a close case, the jury reasonably could have inferred a retaliatory animus in Fitton’s hiring decision.[5]
First, the instruction to document the hiring decision, while probative of Fitton’s knowledge, is not necessarily so as to a retaliatory animus. The instruction to document the process supports an inference that this process was intended to separate Kiely from the other candidates but it does not implicate Fitton in the underlying motive for that decision. Without linking Fitton to that decision, the jury could not reasonably infer that by following the instruction he harbored a retaliatory animus. Second, Fitton’s “course of conduct” in failing to vet Kiely’s qualification, however, is probative of a retaliatory animus. Fitton appropriately began his inquiry with open-ended questions about Hodgdon’s, Senecal’s and Kiely’s qualifications. He did not, however, press for information about Kiely’s skills when Clare and Pierce were unable to speak about her. That Fitton made the hiring decision without ever speaking to anyone about Kiely’s qualifications is telling, especially where Teradyne did not explain at trial why it was necessary to bypass this stage of the process. Fitton’s failure to follow Teradyne’s established policy of posting and interviewing of the candidates could have been connected to a retaliatory animus. These policy lapses did not subject Kiely to disparate treatment because neither Hodgdon nor Senecal had the benefit of a procedure denied to Kiely. Nonetheless, Hodgdon and Senecal were hired, an outcome that could have been different if Kiely had been aware of the position and given the opportunity to tout her qualifications. Lastly, and perhaps most significant, the hiring decision came on the heels of Kiely’s MCAD charge challenging the layoff. Taken together, the confluence of circumstances surrounding the hiring decision were sufficient to allow the jury to infer a retaliatory animus in the decision not to rehire Kiely.
This analysis of the facts relating to Teradyne’s knowledge and intent is consistent with our appellate decisions addressing the issue. In Ciccarelli v. School Dep’t of Lowell, 70 Mass.App.Ct. 787, 794 (2007), the Appeals Court concluded that a jury reasonably inferred from circumstantial evidence that a deputy superintendent knew of a provisional teacher’s protected activity and that it was a factor in her decision not to rehire this teacher. In that case, the provisional teacher had presented evidence that the school’s attorney knew that she was named on the witness list in another teacher’s sex discrimination complaint prior to the deputy superintendent’s decision not to rehire her. Id. The jury reasonably inferred that the deputy superintendent knew of the plaintiffs protected activity because she had been involved in the MCAD matter and would likely have been informed about the addition of the plaintiff to the witness list. Id. at 790-94. Further, the jury reasonably inferred from the passing of only a matter of days between the plaintiff being added to the witness list and the deputy superintendent’s decision not to rehire her that retaliatory animus had been a factor in the decision-making process. Id. at 794.
Where, as here, the jury could have drawn reasonable inferences as to knowledge and causation favorable to Kiely, Teradyne is not entitled to judgment notwithstanding the verdict on her retaliation claim.
C. The Punitive Damages Award[6]
Teradyne challenges the punitive damages award on two grounds: (1) that Kiely failed to proffer sufficient evidence to establish retaliation so “outrageous or egregious” as to warrant punitive damages; and (2) that the amount of the punitive damages award is excessive. Though mindful that the jury’s award of punitive damages should be sustained “if a plaintiff has presented any evidence from which the jury reasonably could have arrived at that verdict,” Labonte v. Hutchins & Wheeler, 424 Mass. 813, 821 (1997), I conclude nonetheless that the evidence in this case *545 was insufficient to warrant punitive damages. Therefore, I do not address Teradyne’s latter point.[7]
The analysis begins with Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91 (2009), where the Supreme Judicial Court articulated the standard for an award of punitive damages:
To sustain an award of punitive damages under G.L.c. 15 IB, §4, a finding of intentional discrimination alone is not sufficient. An award of punitive damages requires a heightened finding beyond mere liability and also beyond a knowing violation of the statute. Punitive damages may be awarded only where the defendant’s conduct is outrageous or egregious. Punitive damages are warranted where the conduct is so offensive that it justifies punishment and not merely compensation. In making an award of punitive damages, the fact finder should determine that the award is needed to deter such behavior toward the class of which plaintiff is a member, or that the defendant’s behavior is so egregious that it warrants public condemnation and punishment. (Emphasis supplied.)
Id. at 110-11. Whether a plaintiff has met this standard of “outrageous or egregious” conduct is to be measured by applying the specific factors set out in Haddad. Those factors are as follows: (1) whether there was a conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part (or the plaintiff because he or she is a member of the class); (2) whether the defendant was aware that the discriminatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise; (3) the actual harm to the plaintiff; (4) the defendant’s conduct after learning that the initial conduct would likely cause harm; and (5) the duration of the wrongful conduct and any concealment of that conduct by the defendant. Id. at m.
Upon consideration of the trial evidence in accordance with the Haddad test, I conclude that Kiely did not meet her burden to establish that Teradyne’s conduct was so outrageous or egregious as to warrant public condemnation and punishment. Beyond the facts and inferences supporting the retaliation verdict, i.e., that Fitton was aware of Kiely’s MCAD action, that he documented her hiring process when this was not part of Teradyne’s standard hiring practice, that he did not vet Kiely’s skill as a technician prior to rej ecting her as a candidate for one of the test technician positions, and that his decision not to rehire Kiely occurred within a few weeks of her protected conduct, this record is devoid of any evidence that meets the Haddad standard.[8]
Without specifically addressing the Haddad factors, Kiely argues in her opposition that Teradyne’s retaliatoiy conduct meets that test because the jury necessarily concluded that the defendant’s witnesses “lied” under oath and that Kiely was subjected to a “retaliatory climate at Teradyne where everyone from supervisors to HR to the legal department made it clear that Ms. Kiely was unwelcome at Teradyne.” Neither contention, even if true, makes the case for punitive damages.
A verdict for Teradyne means only that the jury disbelieved Teradyne’s witnesses; it is not necessarily true, as Kiely suggests, that the witnesses “lied under oath.” If indeed the witnesses “lied under oath” and if lying under oath, without more, justified punitive damages, such damages could be awarded in every case where a plaintiff prevails. Clearly, that result is not consistent with the policy underlying the award of punitive damages: public condemnation and punishment of especially “outrageous or egregious” conduct. This argument simply restates the threshold point that Kiely prevailed and it does not support an award of punitive damages. To the extent that Kiely relies on Ciccarelli v. School Dep’t of Lowell, 70 Mass.App.Ct. 787 (2007), to support this argument, it is inapposite. In Ciccarelli, the court ruled that the jury could have found that the city official’s testimony was false and that it was designed to facilitate a cover-up of her wrongdoing. Even if the witnesses testified falsely, Kiely offered no evidence from which the jury could find that Teradyne retaliated against her and orchestrated a cover-up of the real reasons for not rehiring her.
Although it is not clear what Kiely means when she refers to a “retaliatory climate,” nothing in the evidence suggests that such an environment existed or that Kiely suffered adverse employment actions because of it. Kiely insisted at trial that Clare, Pierce and Trapani were intent on retaliating against her and that they did so when they recommended Hodgdon and Senecal. However, there was absolutely no evidence that they gave false information to Fitton or otherwise scuttled Kiely’s opportunity to be hired into one of the two positions.
Nor do the Haddad factors weigh in favor of a punitive damages award. First, the evidence did not establish that Teradyne’s action in failing to rehire Kiely was part of a conscious or purposeful effort to demean females as a class. Indeed, the jury’s rejection of Kiely’s gender discrimination claim seriously undermines any suggestion of gender bias generally or against Kiely in particular. In addition, Kiely had survived a series of lay-offs over the years to remain as the only female among the last three test technicians.
Second, this court assumes that any employer who engages in prohibited conduct will be aware that it will cause harm. Therefore, this factor favors Kiely.
Third, the jury’s refusal to award compensatory damages weighs against Kiely on the “actual harm” factor. Although not necessarily dispositive, the absence of “actual harm” weakens Kiely’s attempt to demonstrate the propriety of the punitive damages *546 award in this case. Harm to the plaintiff is an essential part of the punitive damages calculus, perhaps even the raison d’etre for punishment and condemnation of a defendant’s conduct.
The fourth and fifth factors, the defendant’s conduct after learning that the initial conduct would likely cause harm and the duration of the wrongful conduct and any concealment of that conduct by the defendant, are left to the realm of speculation as these issues were not addressed directly or indirectly by the evidence at trial.[9] Unlike the defendants in Clifton, there was no evidence that Teradyne took any adverse action against Kiely beyond the retaliation itself. Also, the retaliation was a discrete act and there was no evidence to suggest that Teradyne undertook a course of conduct to orchestrate a cover-up. While retaliation of any kind is reprehensible and, of course, unlawful, the particular conduct in this case simply does not rise beyond the unlawful retaliation the jury found it to be.
The retaliation in this case, while reprehensible, simply does not meet the threshold for an award of punitive damages as demonstrated in our cases which have upheld such damages. In Ciccarelli, the Appeals Court affirmed a punitive damages award in an employment action under G.L.c. 151, §4 where the jury reasonably could have concluded that a high ranking official, the deputy superintendent, had learned that teacher was on the witness list in co-worker’s MCAD action, decided not to approve her rehire, and fabricated an excuse for her rejection as punishment for the teacher’s agreeing to testify. In Clifton v. Massachusetts Bay Transp. Auth., 445 Mass. 611 (2005), the Supreme Judicial Court in dicta acknowledged the propriety of punitive damages where the jury could have found that the African-American plaintiff was subject to a pattern of egregious racial harassment and retaliation by both supervisors and co-workers throughout nine years of his employment at the MBTA.[10] Id. at 613-14. In Dalrymple v. Town of Winthrop, 50 Mass.App.Ct. 611 (2000), punitive damages were warranted where the defendant police chief who was “charged with the public duty to enforce the law equally [was] shown to have deliberately violated it for reprehensible reasons.” Id. at 621. In Contardo v. Merrill, Lynch, Pierce, Fenner & Smith, 753 F.Sup. 406 (D.Mass. 1990), the court affirmed the juiy’s award of punitive damages as a means of “deterring . . . endemic and habitual discrimination against women by undisciplined discretionary decisions in workplaces dominated by men.” Id. at 411. This case is more like Dartt v. Browning-Ferris Indus., Inc., 427 Mass. 1, 17 (1998), where the court, in ordering a new trial because of errors of law in the evidentiary rulings, held that the award of punitive damages was not warranted and that the issue should not be submitted to the jury on retrial. The plaintiffs claim that he was terminated because of his handicap, without more, did not rise to the level of outrageous or egregious conduct necessary for an award of punitive damages. Likewise, Kiely failed in her burden to prove an entitlement to punitive damages, compelling an order allowing Teradyne’s motion.
ORDER
For the reasons explained above, Teradyne’s motion for judgment notwithstanding the verdict on Kiely’s retaliation claim is DENIED. Teradyne’s alternative motion to vacate the punitive damages award is ALLOWED.

 Kiely’s complaint asserted claims for unequal pay, failure to promote, discriminatory lay-off and retaliation. This court, (Kaplan, J.) granted summary judgment to Teradyne on all claims except those alleging a discriminatory lay-off and retaliation.

 Based on the trial evidence, the jury could have found that Kiely frequently used intemperate language, ignored lines of authority, refused to take direction from her supervisors and clashed with male and female managers. The court takes no position on whether these personality traits were the product of the male-dominated workplace or whether they contributed if they reflect Kiely’s herself. These facts are mentioned here only as context for the jury’s rejection of Kiely’s gender discrimination claims.

 Fitton subsequently spoke with Trapani about Kiely, but he did not inquire about Kiely’s technical skills.

 Kiely impeached Trapani with his deposition testimony which appeared to be inconsistent with his trial testimony.

 Teradyne relies in part on statements made by the court that Kiely had failed to offer evidence of a retaliatory motive. This comment was made in connection with Kiely’s argument that the jury could infer Fitton’s retaliatory animus from the fact that he had spoken to Clare, Pierce and Trapani before making the hiring decision. The court’s point was that Kiely had offered no credible evidence of a retaliatory motive by Clare, Pierce or Trapani that might be attributed to Fitton.

 During the charge conference, this court explicitly stated the view that the evidence did not warrant an award of punitive damages. The issue was submitted to the jury, however, in conformity with the admonition of our appellate courts to submit claims to the jury where there is any support in the evidence for a particular claim. See Smith v. Ariens, 375 Mass. 620, 627 (1978). The standard on a motion for judgment notwithstanding the verdict is different, requiring an assessment of whether the evidence “reasonably” supports the juiy’s verdict.

 It is not clear that the court properly can consider whether the punitive damages award is “excessive” where Teradyne has not moved for a new trial or remittitur under Mass.R.Civ.P. 59(a). See Clifton v. Massachusetts Bay Transp. Auth., 445 Mass. 611, 623 (2005) (court’s discretion to reduce an excessive punitive damages award linked to authority under Mass.R.Civ.P. 59(a) to “bring the award within the range of verdicts supported by the evidence").

 The evidence proffered by Kiely focused more directly on her case for discrimination and retaliation and less so, if at all, on the specific factors necessary to support an award of punitive damages.

 See footnote 8, supra.

 In Clifton, supervisors and co-workers “shot bottle rockets at him, turned the lights off when he used the bathroom, sprayed water at him through fire hoses, dropped firecrackers near him, set water boobytraps that would fall on him when he opened his office door, painted ‘fag bait’ and ‘Sanford and Son’ on his locker . . . and called him a ‘fucking banana’ ” among other things.