Ferrara, John S., J.
Defendant Baystate Medical Center, Inc. moves for judgment notwithstanding the verdict and other relief after a jury found in favor of plaintiff Michael Saxe. In accordance with the discussion below, defendant’s motion is DENIED in its entirely.
BACKGROUND
This matter was tried to a jury from June 26, 2014 through July 2, 2014. The jury returned a verdict for defendant on plaintiffs gender discrimination claim, but found for plaintiff on his retaliation claim. The jury awarded plaintiff $6,850.00 in back pay, $50,000.00 for emotional distress, and $200,000.00 in punitive damages.
*90 On July 17, 2014, plaintiff filed a motion for attorneys fees and costs, and for an additur. Judgment on the jury verdict entered on July 30, 2014.
On August 1, 2014, defendant filed a notice of motion for judgment notwithstanding the verdict, for a remittitur, or for a new trial, and served that motion upon plaintiffs counsel. Thereafter, plaintiff moved for an extension of time to serve his opposition to defendant’s motion a number of times, and those motions were allowed.
On September 26, 2014, defendant requested leave to file a reply to plaintiffs opposition, which plaintiff opposed, and the request was denied (Page, J.). Defendant then served a motion to strike parts of plaintiffs opposition, and plaintiff filed an emergency motion to strike defendant’s motion to strike plaintiffs opposition. This prompted me to order on October 7, 2014 that the parties not serve any more motions to strike, oppositions, or “emergency” motions, and that all motions served as of October 2, 2014 should be filed, and a hearing on all motions filed would be conducted on a date convenient to the parties.
On October 8, 2014, defendant filed its JNOV motion and plaintiffs opposition, along with defendant’s motion to strike plaintiffs opposition, and plaintiffs opposition thereto. A hearing on the motions was conducted on November 26, 2014.
DISCUSSION Standard of Review
In considering a defendant’s motion for judgment notwithstanding a juxy verdict, “the judge’s task, taking into account all the evidence in its aspect most favorable to the plaintiff, is to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff’ (internal quotation marks removed). Phelan v. May Dep't Stores Co., 443 Mass. 52, 55 (2004), quoting Tostt v. Ayik, 394 Mass. 482, 494 (1985). All evidence favorable to the defendant is disregarded. Ciccarelli v. School Dept. of Lowell, 70 Mass.App.Ct. 787, 791 (2007). The verdict must be sustained if “anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.” Haddad v. Wal-Mart Stores, Inc. (No. 1), 455 Mass. 91, 94 n.5 (2009), quoting Boothby v. Texon, Inc., 414 Mass. 468, 470 (1993). A judgment notwithstanding the verdict should be granted, however, when an “essential element of [the plaintiffs] case rests upon a ‘mere scintilla’ of evidence.” Stapleton v. Macchi, 401 Mass. 725, 728 (1988), quoting Hartmann v. Boston Herald-Traveler Corp., 323 Mass. 56, 59 (1948). “Because the jury are a pillar of our justice system, nullifying a jury verdict is a matter for the utmost judicial circumspection.” Cahaly v. Benistar Prop. Exch. Trust Co., 451 Mass. 343, 350 (2008).
Evidence in Light Most Favorable . to Non-Moving Party
I have reviewed defendant’s motion, plaintiffs opposition, and defendant’s motion to strike portions of plaintiffs opposition and plaintiffs opposition thereto, and portions of the trial transcripts, and I have given due consideration to the arguments of the parties. Though defendant’s memorandum in support of its motion recites the proper standard, defendant’s argument nevertheless presses for assessments of credibility and consideration of testimony that conflict with the jury’s verdict. However, I must construe the evidence in the light most favorable to plaintiff. I find that the jury could reasonably have found the following.
Saxe was employed as a security guard at Baystate Medical Center (“Baystate”) from August 2007 through April 2011. He had favorable annual evaluations by his supervisors during that period. On February 25, 2011, he reported to his supervisor, Monica Wynne, that he had obtained a harassment protection order against a female co-worker, Kate Cavanaugh, earlier that day. Saxe and Cavanaugh had been platonic friends, but had become estranged because Cavanaugh had pressed Saxe for a more personal, intimate relationship, and he had declined. Saxe reported to Wynne that some of the harassment was occurring in the workplace. He provided names of Baystate employees who were aware of Cavanaugh’s actions, and showed Wynne some text messages he had received from Cavanaugh. Saxe’s complaints were also made known to a supervisor of security, Nahdra McKenzie. Baystate’s written policies mandated that there be an investigation of his complaints.
The investigation was principally conducted by McKenzie, with assistance from Dana Kendzior, supervisor of the emergency department where Cavanaugh worked, and Thomas Lynch, director of security. Wynne, who was Saxe’s supervisor, had input into the investigation. Joanne Davis, the director of human resources, was McKenzie’s supervisor. The jurors would have been warranted in concluding that Davis was biased in favor of Cavanaugh from the outset and likely had influence over the outcome of the investigation. McKenzie testified that she and Davis regularly discussed the investigation. Cavanaugh testified that she first met with Davis on March 1, 2011, about a week after Saxe’s complaint. Davis told her, “I’m your girl,” which Cavanaugh reasonably understood to mean that Davis would support her in the matter. On March 11, when Cavanaugh informed Davis that Saxe had not sought to extend the harassment prevention order, Davis told Cavanaugh, “That’s good news, it blows up his whole case.”
Saxe’s claims of harassment were treated as suspect despite the text messages that corroborated certain of his claims. Baystate did not promptly and firmly deter Cav-anaugh from disparaging Saxe in the workplace. Cavan-augh continued to spread rumors about him in the emergency department, prompting Saxe to alert McKenzie to the ongoing nature of the problem twice in March.
*91 The investigators seemed more intent on finding inconsistencies in Saxe’s statements than assessing the merits of his claims. The investigation focused on whether or not Saxe had communicated with Cavanaugh after he had obtained the harassment prevention order, and whether he had discussed that court order with co-workers. Lynch questioned Saxe about the frequency and timing of his communications with Cavanaugh after issuance of the court order. Saxe offered to provide phone records to Lynch to show the timing of calls or messages, and later did provide those phone records. He also offered to provide his phone to both Lynch and McKenzie so that they could view saved text messages between Cavanaugh and him. Lynch suggested to McKenzie that she obtain Cavanaugh’s phone records to resolve a conflict in the statements of Saxe and Cavanaugh regarding the timing and frequency of their communications. Cavanaugh failed or refused to produce those records upon request. McKenzie nevertheless credited false representations made by Cavanaugh regarding phone contact between her and Saxe, as well as Cavanaugh’s claim that Saxe had continued to contact her throughout the period of the investigation.
The jurors could have found that the principal investigator, McKenzie, failed to interview a number of witnesses whom Saxe had identified as having knowledge of his claims and disregarded information provided by certain witnesses who were interviewed. The jurors might also have reasonably found that McKenzie delayed interviewing Saxe for three weeks during which time she had decided that Saxe’s claims were frivolous or false. She believed that Saxe’s claims arose from a “disagreement” between Saxe and Cavanaugh, and accepted Cavanaugh’s representation that she and Saxe had had a romantic relationship, and that Saxe had sought the court order only because Cavanaugh was going to seek one against him. McKenzie did not review the harassment order and supporting affidavit though a copy had been provided to her.
McKenzie met with Saxe on March 28, 2011. He offered to show her text messages that Cavanaugh had sent him and to permit her to examine his telephone, so that she might review the contact history. He also was prepared to provide Facebook messages that Cavanaugh had been sending his mother. McKenzie told him that she did not need to see the messages or the phone; she had everything she needed. Saxe told her that he felt the investigation was biased because a man was complaining about harassment by a woman. McKenzie then accused him of lying about not having communicated with Cavanaugh after he had obtained the court order. The evidence supported that Saxe had not contacted Cavanaugh after February 25, 2011, the date that he had obtained the harassment prevention order, and that he had only contacted her on that date after the order had issued to advise her of the order and later to respond to a call from Cavanaugh. Cavanaugh had claimed that Saxe had continued to contact her. McKenzie asked Saxe, “Why would Cavanaugh lie?”
Saxe was thereafter suspended for lying and purportedly impeding Baystate’s investigation. The jurors appear to have credited Saxe’s explanations regarding his statements about communications with Cavan-augh, supported by his phone records, and accepted his testimony that he had not lied. The jury was warranted in concluding that Baystate’s claimed reason for suspending Saxe was pretextual; that Baystate distorted his statements and exaggerated the impact of the alleged false statements on Baystate’s investigation. A review of the cross examination of McKenzie virtually compels that conclusion.
Lynch, as the director of the security department, was the person who had to formally suspend Saxe, but the jurors were warranted in concluding that McKenzie had decided the issue. Wynne learned from McKenzie that Saxe was to be suspended and e-mailed Lynch to let him know that McKenzie would be calling him to inform him of the suspension. She concluded her e-mail by stating, “I’m sony I’m going to miss this.” When Lynch notified Saxe that he was suspended, Saxe stated that he felt he was being discriminated against because of his gender. Reasonable jurors could agree with that assessment.
Baystate had a policy of terminating personnel with three warnings within a year, and Saxe had had two prior warnings. The jury could have found that the prior infractions were minor and/or unfair.[1] Nonetheless, the suspension resulted in Saxe’s termination. The evidence supported the conclusion that the treatment of Cavan-augh during the course of the investigation was comparatively deferential. Aside from the assurances of support given her by Davis, she was not punished for making false statements to investigators, for continuing to discuss Saxe and the harassment order with co-workers after being directed not to do so, or for violating a supervisor’s order not to contact Saxe during the pendency of the investigation. McKenzie accepted Cavanaugh’s explanation of why she had contacted Saxe, despite reason to question Cavanaugh’s credibility.
I find that the jury could reasonably have concluded that Baystate failed to take steps to promptly remediate the harassment of which Saxe had complained and that its investigation was biased. Saxe complained to Baystate about its failure to adequately address Cavanaugh’s spreading rumors about him, and expressed his belief, a reasonable one under the circumstances, that Baystate’s investigation was biased because of his gender—because a man was complaining of harassment by a woman. The jury could also have reasonably found that Baystate suspended and terminated Saxe as a result of his complaints about Baystate’s handling of his harassment claims and his expressing that the investigation was biased.
The Evidence Justified an Award of Damages for Emotional Distress
Saxe, who made the complaint of harassment, was suspended and terminated. The “harasser” was ultimately not disciplined. His integrity and truthfulness *92 were questioned and unfairly challenged. Saxe testified that, after he was terminated, he went to his car and called his mother, with whom he was living, and' he “broke down.” He went home and remained isolated there for days, perhaps as long as several weeks. He spent most of his time in his bedroom. He testified that he was “very upset... it was a tough time.” He did not speak with friends and ignored and did not return telephone calls from them.
Saxe felt immediate financial distress and uncertainly. He had been helping his parents pay their mortgage and the family was somewhat dependent on his income. The firing effectively precluded him from requesting letters of reference from Baystate to facilitate obtaining future employment. However, he was able to find another job about six weeks later.
I find that an award for emotional distress was reasonable and warranted, and I do not find the $50,000.00 awarded to be excessive.
Punitive Damages Award Was Warranted and Was Not Excessive
Punitive damages are assessed to punish the defendant for wrongdoing and to deter similar conduct by the defendant and others. In discrimination and retaliation cases, it is not enough for the plaintiff to prove that the defendant violated G.L.c. 15 IB, §4; the plaintiff must additionally prove that the defendant’s conduct was “outrageous or egregious.” Haddad, 455 Mass, at 110. The jurors could reasonably conclude that Baystate’s response to Saxe’s complaint of harassment was outrageous and egregious. Joanne Davis, Baystate’s director of human resources, told Cavanaugh that she was going to support her with respect to Saxe’s complaints before any investigation had begun. The jury was warranted in concluding that the investigation was a sham, and that Baystate suspended and fired Saxe because he told Nahdra McKenzie that he thought it was a biased investigation because of his gender. The net outcome was that the person who was harassed was fired, and the harasser was ultimately not disciplined. Baystate had to know that Saxe’s suspension, under the circumstances, would be perceived by him as unjust and would be highly upsetting. The termination was a final action that left Saxe unemployed and effectively precluded him from requesting letters of reference from Baystate. Baystate gave Saxe a pretextual reason for suspending him and then persisted in concealing its true reason for his suspension right through the time of trial. See id. I cannot say that the award of punitive damages was unwarranted.
The punitive damages award was three and one-half times the compensatory damages awarded. It was not in excess of the “single digit ratio” that might make the amount constitutionally suspect. State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003); Labonte v. Hutchins & Wheeler, 424 Mass. 813, 826 (1997) (“Common law and constitutional principles mandate that courts review the amount to ensure that it is reasonable and not simply a criminal penalty”). Given the evidence presented, I am not troubled by the amount of punitive damages assessed by the jury.
There Is No Basis for Granting Defendant a New Trial
Defendant claims that it is entitled to a new trial because the jury instructions did not adequately define what constitutes a “protected activity” under chapter 15 IB for the jury. Defendant’s objection to the court’s instructions was general; “(T]he defendant objects to the Court’s charge to the extent it’s in variance with defendant’s requested charge and for the reasons that we’ve stated both yesterday and today.” The objection was not sufficiently specific, as required by M.R.C.P. Rule 51,[2] to alert the court to an issue with respect to the instructions regarding “protected activity.” Furthermore, the instruction, as a whole, was adequate. Defendant’s proposed instruction on “protected activity,” found at page fourteen of its proposed instructions, distorted plaintiffs theory of the case by asserting that the claimed “protected activity” was Saxe’s complaint about harassment, rather than his complaints about the biased nature of the investigation of his complaints.
My review of the instructions causes me to conclude that the jury was not instructed that they could find that defendant had retaliated against plaintiff merely from the timing of an adverse action close upon the heels of protected activity. Defendant is also mistaken in its argument that the court did not separately instruct the jurors with respect to plaintiffs retaliation claim that they could consider defendant’s “business judgments” and stated reasons for suspension and termination of Saxe. With respect to the punitive damages instruction, it is substantially—nearly verbatim—the instruction that defendant requested.
ORDER
For the foregoing reasons, defendant’s motion for judgment notwithstanding the verdict or for remittitur is DENIED. Defendant’s request for a new trial is DENIED.

 The first infraction, in September 2010, was for participating in a football betting pool. Many people at the hospital, including doctors and supervisors, participated in these football pools without sanction. The second warning notice he received was in October 2010, for six “unplanned attendance events.” An “unplanned attendance event” included calling in sick to work. Even though Saxe was entitled to sick days, he received a disciplinary notice for using them. After each of these warnings, Saxe “grieved” the warnings to Nahdra McKenzie, arguing that they were unfair. She was dismissive of his complaints on those earlier occasions.

 No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection” Mass.R.Civ.P. 51(b).