# United States Court of Appeals
## For the First Circuit

No. 17-2033

SCOTT L. HEAGNEY,

Plaintiff, Appellee,

v.

LISA A. WONG; CITY OF FITCHBURG,

Defendants, Appellants,

BADGEQUEST, INC.; STEPHAN UNSWORTH,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Torruella, Thompson, and Barron,
Circuit Judges.

Leonard H. Kesten, with whom Judy A. Levenson, Deidre Brennan
Regan, and Brody, Hardoon, Perkins & Kesten, LLP were on brief,
for appellants.
Nicholas B. Carter, with whom Joseph M. Cacace and Todd &
Weld LLP were on brief, for appellee.

February 11, 2019

**BARRON**, **Circuit Judge**.  This case concerns a suit that Scott Heagney, a past applicant for the position of the police chief of Fitchburg, Massachusetts, brought against the City of Fitchburg ("Fitchburg") and its mayor after the mayor decided not to nominate him for the job.  The mayor made her decision after she discovered late in the hiring process that Heagney had not disclosed, among other things, that he was charged with serious criminal offenses (of which he was later acquitted at trial) during the time period in which he was employed at another local police department.  The mayor was quoted thereafter in local newspapers explaining her decision not to nominate Heagney for the position.

Heagney's suit claims that Fitchburg violated his rights under Massachusetts General Laws Chapter 151B by basing its decision not to hire him for the position on his failure to disclose the criminal case against him.  Heagney's suit also claims, under Massachusetts law, that the mayor defamed him through statements that she made to the local newspapers explaining the decision.

At trial, the jury found for Heagney on both claims. For the defamation claim, the jury awarded Heagney $750,000 in compensatory damages and for the Chapter 151B claim, no compensatory damages but $750,000 in punitive damages.  The District Court denied Fitchburg's motions for judgment as a matter of law and for a new trial or remittitur, and entered judgment for

Heagney. Fitchburg now appeals. We reverse the judgment on the defamation claim, affirm the judgment on the Chapter 151B claim, and reverse the award of punitive damages for the Chapter 151B claim.

## I.

Heagney first submitted his application for the position of Fitchburg Police Chief in October 2013. On the résumé accompanying his application, Heagney listed positions that he had held at the Police Department of Franklin, Massachusetts from 1987 to 2001 and at the United States Bureau of Alcohol Tobacco and Firearms ("ATF"), where he had been employed since 2001.

Heagney did not list on his résumé, however, his prior employment as an officer in the Police Department of Falmouth, Massachusetts where, after being fired by the Franklin Police Department, he had worked from 1990 to 1993. Instead, on his résumé, Heagney stated that he had worked as a patrolman at the Franklin Police Department from 1987 to 1994, without noting the break in his service. Heagney also did not list his prior employment at the Police Department of Attleboro, Massachusetts, where he had worked from 1985 to 1987.

As part of the application process, Heagney was also asked to fill out a standard employment application. The application asked candidates to list their employment for the past fifteen years. Heagney stated in the application only that he had

worked in the Franklin Police Department from 1987 to 2001 and at the ATF from 2001 to present. He also answered "no" to two questions: "Have you ever been disciplined, fired or forced to resign because of misconduct or unsatisfactory employment?" and "Prior to the hiring of our next police chief, a thorough and comprehensive background investigation will be conducted. Are there any issues that we should be aware of that would arise during such an investigation?"

Over the course of several months, Bernard Stephens -- Fitchburg's personnel director -- and the rest of the selection committee -- whose members had been chosen by Lisa Wong, the mayor of Fitchburg -- gradually narrowed the pool of potential candidates with the assistance of an "assessment center" and through various interviews. After interviewing the three remaining candidates, Wong chose Heagney as the finalist for the position of Fitchburg Police Chief. She sent an email to the city council on March 10, 2014 announcing her decision to nominate him for the position.

Before Wong would officially nominate any candidate for Fitchburg Police Chief to the city council, however, that candidate was required to pass a background check by BadgeQuest, a consulting firm that Fitchburg had hired to assist in the selection process. Thus, BadgeQuest, at Fitchburg's request, proceeded to complete its background investigation of Heagney. And, after an initial investigation, Stephan Unsworth, Fitchburg's primary contact at

BadgeQuest, communicated BadgeQuest's tentative conclusion to Stephens that "there [we]re no issues in [Heagney's] background that would have a negative impact on [his] suitability for the position of Fitchburg [P]olice [C]hief." Unsworth did indicate, though, that BadgeQuest was still waiting for Heagney's personnel file from the ATF.

The next significant development occurred on March 17, 2014, before Heagney's personnel file arrived from the ATF. On that date, Wong's office received an anonymous letter that raised concerns about Heagney's pending nomination for Fitchburg Police Chief. The letter stated that Heagney had worked and had been involved in various incidents of misconduct at the Attleboro, Falmouth, and Franklin Police Departments. The letter also stated that Heagney had been charged with various criminal offenses related to pistol whipping an individual (which subsequent investigation revealed to be his ex-girlfriend) but that the criminal "case was dismissed[.]"

At Wong's request, Stephens immediately asked BadgeQuest to "check out" the allegations in the letter, which BadgeQuest began to do. Before BadgeQuest had conclusively verified any of the letter's allegations, however, Stephens sent Unsworth an email on the afternoon of March 18, 2014, in which he called off the BadgeQuest investigation into Heagney. In his email to Unsworth explaining why, Stephens gave as "[r]easons": (1) "[y]our question

early on to him about any problems in the past . . . that we should know about. He answered no"; (2) "[a]pplication was not filled out with all the police jobs that he had early in his career"; and (3) "[h]e has lost Mayor Wong's support."

On the afternoon of March 18, 2014, Wong spoke with Heagney and gave him an end-of-business-day deadline to withdraw his name as an applicant for the chief of police position. After that deadline passed and Heagney still had not withdrawn his name, Wong sent an email to the city council in which she withdrew her nomination of Heagney to be the Fitchburg Police Chief. In the email, Wong stated that "[t]he nomination was subject to the execution of a contract and a background check, both of which have been suspended."

Local newspapers covered Wong's withdrawal of Heagney's nomination. One of the articles about this news, written by Paula Owen, appeared in the <u>Worcester Telegram & Gazette</u> and stated: "Now, Ms. Wong claims the 46-year-old ATF agent, who runs the Rochester, N.Y., office, was not forthcoming on his résumé about his work experience or about a court case on alleged assault and battery and other charges when he was 21."[1]

---

[1] That same article also included a statement attributed to Wong that she sent via text to Owen: "The city is not interested in pursuing a candidate for police chief who was not forthcoming with his résumé." Another article, published in the <u>Fitchburg Sentinel & Enterprise</u>, included a statement attributed to Wong

Fitchburg eventually received Heagney's personnel files from the ATF and the Falmouth and Attleboro Police Departments. Those files included the following information related to the "court case" -- and the underlying allegations of criminal conduct by Heagney -- referenced in the anonymous letter. In 1988, Cheryl Collins, Heagney's ex-girlfriend, filed complaints with the Franklin and Wrentham Police Departments against Heagney in which she alleged that he had physically abused and threatened her with a pistol. Following the allegations, Heagney was placed on temporary leave from his job at the Franklin Police Department after an internal investigation. The criminal case against Heagney in Wrentham District Court for assault and battery of Collins with a dangerous weapon ended in Heagney's acquittal.

The personnel files also revealed other disciplinary actions that had been taken against Heagney by police departments at which he had previously worked. Those actions were for various instances of misconduct, including fabricating a police report, acting unprofessionally during a suicide watch, and failing to appear in court for a trial.

---

that "[t]he city [wa]s not interested in pursuing a candidate for police chief who withheld key information about their work résumé and character." The jury rejected Heagney's defamation claims arising from these statements because the jury found that both statements were true. On appeal, the parties do not contest the jury's verdicts as to these statements, so we need not address them here.

In 2015, Heagney filed suit in state court against Wong, Fitchburg, BadgeQuest, and Unsworth. The defendants removed the case to federal court based on diversity jurisdiction. See 28 U.S.C. § 1332(a). Heagney's complaint alleged that all defendants except for Fitchburg had defamed him in violation of Massachusetts law and that Fitchburg had violated Massachusetts General Laws Chapter 151B by not hiring Heagney due to his failure to inform it of the criminal case against him. As relevant here, Chapter 151B provides that it is unlawful for

> an employer, himself or through his agent, . . . to exclude, limit or otherwise discriminate against any person by reason of his or her failure to furnish such information through a written application or oral inquiry or otherwise regarding . . . an arrest, detention, or disposition regarding any violation of law in which no conviction resulted.

Mass. Gen. Laws ch. 151B, § 4(9).

Prior to trial, Heagney settled with BadgeQuest and Unsworth. Heagney then proceeded to trial on his claims against Wong and Fitchburg. At the end of the trial on those claims, the defendants filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which the District Court denied. The case was submitted to the jury. The jury specifically found that Wong had made the statement to the Worcester Telegram & Gazette that Heagney "was not forthcoming . . . about a court case on alleged assault and battery and other charges when he was 21" and that this statement was both false and defamatory. On

- 9 -

this defamation claim, the jury awarded Heagney $125,000 "for damages to his reputation, including emotional distress" and $625,000 "for economic losses."  Separately, the jury found that the other statements at issue were not false.

The jury also found Fitchburg liable, in violation of Chapter 151B, for discriminating against Heagney because of his failure to disclose the information concerning the criminal case against him.  But, with respect to damages, the jury found, based on after-acquired evidence of administrative actions that had been taken against Heagney by other police departments, that Fitchburg would have refused to hire Heagney on the basis of that evidence alone and thus independently of the fact that he had not disclosed the criminal case.  As a result, the jury did not award Heagney any compensatory damages on the Chapter 151B claim.  The jury did award him, however, $750,000 in punitive damages on that claim.

The defendants renewed their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and alternatively requested a new trial under Federal Rule of Civil Procedure 59(a) or remittitur under Federal Rule of Civil Procedure 59(e).  The District Court denied all the motions.  Wong and Fitchburg now appeal.

## II.

Wong's appeal of the denial of both her motion for judgment as a matter of law and for a new trial on Heagney's

defamation claim focuses on the statement attributed to her that appeared in the story by Owen that was published in the Worcester Telegram & Gazette on March 20, 2014. To repeat, the story stated, in relevant part: "Now, Ms. Wong claims the 46-year old ATF agent, who runs the Rochester, N.Y., office, was not forthcoming on his résumé about his work experience or about a court case on alleged assault and battery and other charges when he was 21."

Under Massachusetts law, to prove defamation against a public figure (which Heagney concedes that he is), Heagney must show that: (1) Wong made a statement concerning him to a third party; (2) the statement could damage Heagney's reputation in the community; (3) Wong made the statement with actual malice; and (4) the statement caused economic loss or is actionable without economic loss. See Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510-11 (Mass. 2003).

The jury found that Wong made the entire statement attributed to her in the story by Owen. The jury found that the portion of the statement in which Wong stated that Heagney "was not forthcoming on his résumé about his work experience" was not false. But, the jury found that the portion of the statement in which Wong stated that Heagney "was not forthcoming . . . about a court case on alleged assault and battery and other charges when he was 21" was both false and defamatory. The jury's finding on

- 11 -

that portion of the statement is the sole basis for the finding of liability on Heagney's defamation claim.

We can easily dispose of Wong's threshold contention that the evidence was too slight to permit a jury to find that she in fact made the statement at issue to the Worcester Telegram & Gazette. Owen, the reporter at the Worcester Telegram & Gazette who wrote the March 20, 2014 article, testified at trial that Wong made the statement to her during a phone call. The jury reasonably could have credited Owen's testimony as to that point.

Nevertheless, truth is "an absolute defense" to this defamation claim.[2] Noonan v. Staples, Inc., 556 F.3d 20, 26 (1st Cir. 2009) (citing Mass. Sch. of Law at Andover, Inc. v. Am. Bar

---

[2] A Massachusetts statute permits a plaintiff in a libel action to recover for a truthful defamatory statement if the plaintiff proves that it was made in writing with actual malice. See Mass. Gen. Laws ch. 231, § 92. However, the First Amendment limits the scope of that statute such that "a statement on matters of public concern must be provable as false before there can be liability under state defamation law." Shaari v. Harvard Student Agencies, Inc., 691 N.E.2d 925, 927 (Mass. 1998) (internal quotation marks omitted) (emphasis added); see also Materia v. Huff, 475 N.E.2d 1212, 1216 n.6 (Mass. 1985) ("[A] judge cannot constitutionally apply [the statute] to a public figure or public official."); Ravnikar, 782 N.E.2d at 510 n.3 (noting that "the provisions of the First Amendment to the United States Constitution" limit "[t]he scope of the statute"); White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 (Mass. 2004). Because the parties agree that Heagney is a public figure, see Rotkiewicz v. Sadowsky, 730 N.E.2d 282, 287 (Mass. 2000) (holding that "police officers . . . are 'public officials' for purposes of defamation"), and that the statement at issue was on a matter of public concern, we do not need to address whether Wong made that statement with actual malice if we decide that the evidence was insufficient to show that the statement was false.

Ass'n, 142 F.3d 26, 42 (1st Cir. 1998); McAvoy v. Shufrin, 518 N.E.2d 513, 517 (Mass. 1988)); see also Shaari, 691 N.E.2d at 927. And, under the First Amendment, Heagney bears the burden of showing that the statement at issue was false. See Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776 (1986). Moreover, the First Amendment compels us to "afford plenary review" instead of the "usual deferential Rule 50 standard" to "'mixed fact/law matters which implicate core First Amendment concerns,' such as the jury's conclusions regarding falsity." Sindi v. El-Moslimany, 896 F.3d 1, 14 (1st Cir. 2018) (quoting AIDS Action Comm. of Mass., Inc. v. MBTA, 42 F.3d 1, 7 (1st Cir. 1994)).

Essentially, Wong's position is that the record shows that Heagney was, in fact, "not forthcoming" about the "court case" involving the criminal charges that had been lodged against him in the ordinary sense of being "not forthcoming." After all, she points out, Heagney at no point actually brought the case to the attention of Wong or the search committee. Thus, Wong contends the statement at issue cannot ground a defamation claim because it was true rather than false. And, we conclude, applying plenary review, that, under the ordinary construction of the phrase "not forthcoming," Wong is right. See Oxford Living Dictionaries: English, https://en.oxforddictionaries.com/definition/forthcoming (defining "forthcoming" as "willing to divulge information");

- 13 -

Merriam-Webster Dictionary (2005) (defining "forthcoming" as "characterized by openness, candidness, and forthrightness").

The evidence shows that Heagney had been put on notice that "a thorough and comprehensive background investigation w[ould] be conducted" as part of the selection process. Yet, despite multiple opportunities during that process to do so, Heagney never in fact "alert[ed] the Defendants that his background investigation would reveal [the assault and battery] allegations, the resulting internal affairs investigation, the suspension, and the subsequent criminal charges." In fact, when asked on the initial application form whether he had "ever been disciplined, fired, or forced to resign because of misconduct or unsatisfactory employment" and whether he had "any issues that [the committee] should be aware of," Heagney answered "no."

Heagney nevertheless argues that the jury could have found that the statement at issue was false because it "conveyed that Heagney wrongfully concealed the prior criminal charges because he was obligated to disclose the charges to the City." Heagney contends, in that respect, that the statement was false, because "[t]he law is clear that Mr. Heagney was legally allowed to withhold this information about the prior criminal charges he was acquitted on[.]" See Mass. Gen. Laws ch. 151B, § 4(9).

We do not see, however, why Chapter 151B is relevant to the question of whether the statement at issue was true or false.

- 14 -

The statement makes no assertion as to whether Heagney was protected by Massachusetts law from being asked or required to furnish information concerning the prior criminal case or whether Heagney violated Massachusetts law by not doing so. The portion of the statement at issue simply describes, accurately, his failure to be forthcoming as to the existence of that case. Whether or not, under Chapter 151B, Heagney's failure to furnish the protected information could lawfully provide the basis for Wong's decision to withdraw his nomination for the position thus does not bear on whether he was in fact forthcoming in regard to that information. Certainly the protection afforded to him by Chapter 151B did not in any way bar Heagney from being forthcoming about the criminal case against him if he wished to be.

This conclusion comports with our decision in Noonan v. Staples, Inc., 556 F.3d at 27. There, we declined to construe Massachusetts defamation law to permit "even an objectively true statement [to] give rise to a libel claim if reasonable readers might infer from it other, untrue characteristics of the plaintiff or conduct by him." Id. (noting that "our survey of the relevant Massachusetts law ha[d] uncovered no clear support for this interpretation"). And, under the "much simpler" "truth-or-falsity inquiry" that we continue to discern in Massachusetts law, we find here that "everything said in [Wong's statement] was true . . . ." Id. at 28 (citing Murphy v. Boston Herald, Inc., 865 N.E.2d 746,

- 15 -

754 (Mass. 2007); Jones v. Taibbi, 512 N.E.2d 260, 266 (Mass. 1987)).

In sum, the fact that the statement attributed to Wong may help Heagney in bringing his Chapter 151B claim does nothing to make that statement false rather than true. And yet that statement must be false in order to sustain Heagney's defamation claim. Accordingly, because we conclude that the statement at issue was not false, we need not address whether the evidence sufficed to permit a jury to find any of the other elements of the tort of defamation nor Wong's arguments relating to damages. We thus reverse the judgment on the defamation claim.

## III.

We turn, then, to Fitchburg's challenges to the portion of the judgment that concerns Heagney's claim against Fitchburg for allegedly violating Chapter 151B. As we have noted, the jury found for Heagney on that claim. And, although the jury awarded him no compensatory damages, it did find that he was entitled to a sizable punitive damages award. Fitchburg raises several objections to the District Court's denial of its motion for judgment as a matter of law and for a new trial or remittitur on the Chapter 151B claim as well as to the award of punitive damages. We consider each of these arguments in turn.

Fitchburg first challenges the sufficiency of the evidence with respect to the Chapter 151B claim on the following grounds. Fitchburg contends that the evidence sufficed to show only that it obtained the information about the prior criminal case against Heagney from a third party unprompted, that it did so without either having prompted or directly asked Heagney to disclose it, and that it then relied solely on the content of that information to make its employment decision and not on the fact that the information had not been disclosed by Heagney. Fitchburg then goes on to contend, citing Bynes v. School Committee of Boston, 581 N.E.2d 1019 (Mass. 1991), that, in such circumstances, Chapter 151B does not apply. See id. at 1021-22.

But, Fitchburg makes no argument, that, if the evidence sufficed to show that its decision not to hire Heagney was based on Heagney's failure to disclose information regarding the criminal case, rather than simply on the content of the information itself, Chapter 151B does not apply because Fitchburg never asked him to disclose the information and only obtained it, unprompted, from a third party. Accordingly, if the evidence does suffice to show that Fitchburg declined to move forward with Heagney's candidacy because of the nondisclosure, rather than simply because of the content of the information that he did not disclose, we must reject this sufficiency challenge. And, reviewing "de novo,

[while] viewing the evidence in the light most favorable to the verdict," Kennedy v. Town of Billerica, 617 F.3d 520, 527 (1st Cir. 2010) (citing Jennings v. Jones, 587 F.3d 430, 438 (1st Cir. 2009); Visible Sys. Corp. v. Unisys Corp., 551 F.3d 65, 71 (1st Cir. 2008)), we disagree with Fitchburg's characterization of what the record sufficed to show.

As we have already explained, a jury could reasonably find that Wong made the statement -- confirmed by Owen's in-court testimony and published in the Worcester Telegram & Gazette -- that she withdrew Heagney's nomination because he "was not forthcoming about . . . a court case on alleged assault and battery and other charges when he was 21." That statement quite clearly represents that Wong made that decision not because of the criminal case against Heagney, but because Heagney was "not forthcoming" about that case. Accordingly, we reject this aspect of Fitchburg's sufficiency challenge.

**B.**

Fitchburg next challenges the District Court's charge to the jury, over its objection, that this was a so-called "mixed motive" case. In a Chapter 151B case of this type, the plaintiff need not prove that the prohibited ground for the employment action -- here, Heagney's failure to disclose the criminal case -- was the sole basis for that action. Rather, the plaintiff need only provide "strong" or "direct" evidence that it was one reason.

- 18 -

Haddad v. Wal-Mart Stores, Inc., 914 N.E.2d 59, 76 (Mass. 2009) (internal quotation marks omitted). If the plaintiff makes that showing, the burden then shifts to the defendant to prove that it "would have taken the same action absent the unlawful motive" on the basis of its other "legitimate reason[s], standing alone." Id. at 77 (internal quotation marks omitted).

Fitchburg contends that the District Court erred in issuing the mixed-motive instruction here because Heagney had not put forth the requisite "strong" or "direct" evidence that Fitchburg had relied on an illegitimate reason in refusing to hire him. See id. Relatedly, Fitchburg contends that, insofar as the mixed-motive instruction was warranted, Fitchburg was entitled to judgment as a matter of law because no reasonable jury could find that Fitchburg had failed to meet its burden to prove that it would have refused to hire Heagney even apart from his nondisclosure of the criminal case.

In reviewing whether the evidence suffices to prove discrimination under Chapter 151B on a mixed-motive theory, we must construe the evidence in the light most favorable to the verdict. See id. at 64 n.5. And, we review de novo whether that evidence, so construed, suffices. See Kennedy, 617 F.3d at 527.

Before turning directly to our consideration of Fitchburg's challenge to the evidentiary basis for both the mixed-motive instruction and the sufficiency of the evidence of liability

under that instruction, however, we need to make one point clear at the outset about the focus of our inquiry. That point concerns the timing of the employment decision by Fitchburg that Heagney contends violated Chapter 151B.

Fitchburg contends that the employment decision at issue concerns whether Fitchburg would have ultimately hired Heagney for the position. But, Chapter 151B expressly applies to the decisions of "an employer, himself or <u>through his agent</u>, . . . to exclude, limit, or otherwise discriminate" against an applicant. Mass. Gen. Laws ch. 151B, § 4(9) (emphasis added). And, Fitchburg provides no authority for the doubtful proposition that Wong was not acting in her official capacity as mayor of Fitchburg when she decided not to nominate Heagney or that her official role in the employment decision would have no bearing on whether Fitchburg violated Chapter 151B.

To the contrary, the record supportably shows that Wong's nomination of Heagney was a necessary step before the city council would even consider a candidate. Moreover, Wong did in fact withdraw Heagney's nomination to the city council, which ended Heagney's candidacy for the position.

Thus, we conclude that, to determine whether the evidence sufficed to warrant the mixed-motive instruction -- and, relatedly, whether the evidence sufficed to support a finding of liability under that instruction -- we must consider the portions

of the record that concern Wong's motivation for deciding to withdraw Heagney's nomination. Cf. Price Waterhouse v. Hopkins, 490 U.S. 228, 252 (1989) ("An employer may not . . . prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision.").

The timing of Wong's decision to withdraw Heagney's nomination, however, is itself a source of dispute between the parties, and so we need to address that point up front as well. The parties agree that Wong formally withdrew that nomination in an email to the city council around 5 p.m. on March 18, 2014. Fitchburg asserts that Wong had not yet definitely made up her mind to withdraw her support from Heagney when she made that call. But, Heagney argues, Wong had already made up her mind not to nominate Heagney when she called him around 3:45 p.m. that afternoon to ask him to withdraw his name from consideration.

We conclude that a jury could reasonably infer from the evidence that Wong had already made up her mind not to nominate Heagney at the point that she called him to ask him to withdraw his name. We thus focus on what the record shows about what Wong knew up until that time in assessing both whether the mixed-motive instruction was warranted and whether a reasonable jury could have found that Wong would not have taken the same action on the basis of a motive other than the one prohibited by Chapter 151B.

**1.**

We first address Fitchburg's contention that it was entitled to judgment as a matter of law because Heagney failed to meet his initial burden to provide "either 'direct or strong' evidence" that his failure to disclose the prior criminal case did motivate Wong's decision not to nominate him. Haddad, 914 N.E.2d at 77 (quoting Wynn & Wynn, P.C. v. Massachusetts Comm'n Against Discrimination, 729 N.E.2d 1068, 1078 (Mass. 2000), overruled on other grounds by Stonehill Coll. v. Massachusetts Comm'n Against Discrimination, 808 N.E.2d 205 (Mass. 2004)). "Direct evidence in this context is evidence that if believed, results in an inescapable, or at least highly probable, inference that a forbidden bias was present in the workplace." Wynn & Wynn, 729 N.E.2d at 1078 (internal quotation marks omitted).

"[I]n determining whether a 'mixed-motive' claim survives a motion for judgment as a matter of law, a [district] court must determine whether the plaintiff has put forth sufficient evidence for a jury to conclude that it is more likely than not that the [illegitimate ground] was 'a motivating factor' for the defendant's employment decision." Resare v. Raytheon Co., 981 F.2d 32, 40 (1st Cir. 1992). Reviewing the District Court's determination de novo and reading "the evidence, taking all inferences in favor of [the non-moving party]," Burton v. Town of

- 22 -

Littleton, 426 F.3d 9, 14 (1st Cir. 2005), we conclude that Heagney met his initial burden.

The most "direct" evidence is the statement attributed to Wong in the Worcester Telegram & Gazette that Owen testified that Wong made to her. That statement asserts that Wong withdrew Heagney's nomination because Heagney "was not forthcoming about . . . a court case on alleged assault and battery and other charges when he was 21."

That statement, if attributed to Wong and credited, was certainly not a "[s]tray remark[] in the workplace," "[a] statement[] by [someone] without the power to make employment decisions," or a "statement[] made by [a] decision maker[] unrelated to the decisional process itself." Wynn & Wynn, 729 N.E.2d at 1078. The record, moreover, also contains "strong" circumstantial evidence that Wong was motivated by Heagney's failure to disclose the criminal case. The jury heard testimony that Wong was prepared to send Heagney's nomination to the city council up until the moment that she received the anonymous letter on March 17, 2014 informing her, among other things, that Heagney had been charged with pistol whipping an individual. By her own admission, however, Wong decided to withdraw her support for Heagney before she "knew whether the allegations about the criminal charges mentioned in the letter were true."

- 23 -

"[A] reasonable jury could" thus infer that it was Heagney's failure to disclose the criminal case that motivated Wong's decision to withdraw his nomination. Burton, 426 F.3d at 14. Accordingly, we see no reason to reverse the District Court's determination that Heagney met his burden to "first . . . present a convincing case that there [wa]s an illegitimate motive present." Haddad, 914 N.E.2d at 78.

**2.**

We, turn, then to the question whether Fitchburg carried its burden to show that, "at the time of its decision to exclude . . . Heagney as an applicant for Police Chief, [it] had a lawful, nondiscriminatory reason to do so, and that this lawful reason, standing alone, would have caused it to make the same decision." As to that question, "once the plaintiff has met her initial burden of persuasion on the presence of an illegitimate motive, the decision whether the employer has met its burden of proving that another legitimate, nondiscriminatory reason actually led it to make the decision, is normally for the jury or other finder of fact to decide." Wynn & Wynn, 729 N.E.2d at 1081. In fact, we may overturn the jury's verdict only "when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Monteagudo v. Asociación de Empleados del Estado Libre Asociado de P.R., 554 F.3d 164, 170 (1st Cir. 2009). And, in

reviewing the sufficiency of the evidence on that score, "we may not take into consideration the credibility of witnesses, resolve conflicts in testimony, or in any other manner weigh the evidence." Álvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 23 (1st Cir. 1998).

Fitchburg points to two non-discriminatory reasons that, it contends, the record indisputably shows would have been the basis -- even setting aside Heagney's failure to disclose the prior criminal case -- for its decision not to go forward with Heagney's candidacy. But, we are not persuaded that a reasonable jury would have been required to find that Wong would have withdrawn Heagney's nomination based on these reasons alone.

First, Fitchburg points to Heagney's omissions regarding his prior employment history. Fitchburg did provide some evidence that Heagney's omissions in this regard in fact motivated Wong's decision not to nominate him. For example, the record supportably shows that, by the time that she made up her mind not to nominate Heagney, Wong had learned the following. The record supportably shows that Wong had learned that Heagney had not disclosed on his résumé or his application materials that he had worked at the Falmouth Police Department from 1990 to 1993, despite representing on those materials that he had worked as a patrolman in the Franklin Police Department from 1987 to 1994. And, the record supportably shows that Wong had learned that Heagney had worked at

the Attleboro Police Department from 1985 to 1987, even though that information had not been provided on Heagney's résumé or his application materials. Wong also testified that she decided to withdraw her support on the basis of those omissions because she had concluded that Heagney would not be successful before the city council given that "the only information [she] could give the council was that what [she] had given them, his résumé, was a lie."

But, Heagney testified that, although he had not included his prior work at the Attleboro and Falmouth Police Departments on his résumé or application materials, he had told Wong and other search committee members during a phone interview conducted on March 3 and during an in-person interview conducted on March 8 about his experience working at those departments. The record also supportably shows that Wong was ready to nominate Heagney after the latter interview.

Thus, a jury could reasonably find on this record that what changed between March 8 and March 18 was Wong's receipt of the anonymous letter. A jury could reasonably have credited Heagney's testimony that, by the time that Wong's office had received the letter on March 17, he had already informed Wong of his previous employment at the Attleboro and Falmouth Police Departments. If a jury credited that testimony, then it could reasonably infer that Wong was already aware of that previous employment and its omission from Heagney's résumé and application

materials when she chose him as the finalist.  Accordingly, a jury could reasonably find, on this record, that Wong would not have withdrawn Heagney's nomination when she did based only on his failure to include this employment on his application materials. For this reason, the record does not support Fitchburg's contention that no reasonable jury could find that Wong's motives were mixed.

Second, Fitchburg argues that the record indisputably shows that Wong would have decided not to nominate Heagney solely because Heagney was "combative, insubordinate, and rude" during her call with him where she asked him to withdraw.  But, as we have explained, we must conclude, after reading the evidence in the light most favorable to the verdict, that a reasonable jury could have found that Wong had already made up her mind not to nominate Heagney before she got on the phone with him. Accordingly, this line of argument also lacks merit.

## c.

Fitchburg next challenges the District Court's "after-acquired evidence" instruction to the jury, which stated, in relevant part:

> [E]vidence that . . . sometime after the city excluded
> Mr. Heagney as an applicant, the city acquired evidence
> that Mr. Heagney was subject to administrative actions
> that may or may not have constituted discipline while
> serving as a police officer . . . is so-called after-
> acquired evidence, and its purpose is limited. . . .
> [I]t is irrelevant to the question of whether defendants
> are liable for violating General Law Chapter 151B.
> Rather, the possible relevance would be to limit or

> exclude damages that you might find that Mr. Heagney
> suffered as a result of any violation.

Based on this instruction, the jury found that "the administrative action taken against Scott L. Heagney was of such severity that, had . . . Fitchburg known of this administrative action in March 2014, it would have in fact refused to hire Scott L. Heagney on those grounds alone." The jury therefore awarded Heagney no compensatory damages on his Chapter 151B claim.

Fitchburg contends that the District Court's "characterization of [the] files from other departments and the ATF as 'After Acquired Evidence'" and the resulting exclusion of evidence relating to those files were so "highly prejudicial to the City" that it is entitled to a new trial.[3] We review the District Court's "denial of a motion for a new trial for abuse of discretion." Teixeira v. Town of Coventry by & through Przybyla, 882 F.3d 13, 16 (1st Cir. 2018) (citing Ira Green, Inc. v. Military Sales & Serv. Co., 775 F.3d 12, 18 (1st Cir. 2014)). "An abuse of discretion will be found whenever a reviewed ruling is based on an error of law." Ira Green, 775 F.3d at 18. Because Fitchburg

---

[3] Fitchburg appears to have argued below that the jury's finding that Fitchburg would not have hired Heagney had it known of the administrative actions against him -- which it contends the jury should have been allowed to consider in determining liability -- means that the "Court should enter a judgement for the City on the [Chapter] 151B claim." But, Fitchburg seems to have abandoned that argument on appeal, arguing only that the alleged error in issuing the "After-Acquired Evidence" instruction means only that "[t]he judgment against the City on this claim must be vacated."

raises a "question[] as to whether [the] jury instruction[] capture[s] the essence of the applicable law," we "afford de novo review." Teixeira, 882 F.3d at 16 (quoting DeCaro v. Hasbro, Inc., 580 F.3d 55, 61 (1st Cir. 2009)).

We note that Massachusetts law has not yet expressly "adopted, or declined to adopt, th[e] [after-acquired evidence] doctrine." EventMonitor, Inc. v. Leness, 44 N.E.3d 848, 851 (Mass. 2016) (citing Flesner v. Technical Comm'ns Corp., 575 N.E.2d 1107, 1113-14 (Mass. 1991); Prozinski v. Ne. Real Estate Servs., LLC, 797 N.E.2d 415, 425 (Mass. App. Ct. 2003)). But, we need not decide whether Massachusetts law has "implicitly adopted" the doctrine. Prozinski, 797 N.E.2d at 425. Fitchburg challenges the instruction only on the ground that it erroneously stated that the jury could consider the after-acquired evidence solely for the limited purpose of assessing damages and not also for the purpose of assessing liability.

Specifically, Fitchburg concedes that there is much precedent in "wrongful discharge" cases limiting the consideration of after-acquired evidence only to the assessment of damages and not liability. See, e.g., Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 101 (1st Cir. 1997) ("[A]fter-acquired evidence is normally admissible only as to remedy, and not on liability."); Kapche v. Holder, 677 F.3d 454, 464 (D.C. Cir. 2012) ("[E]vidence of the plaintiff's wrongdoing acquired subsequent to an employer's

discriminatory hiring decision does not negate liability."); Serrano v. Cintas Corp., 699 F.3d 884, 903 (6th Cir. 2012) ("[A]fter-the-fact evidence of [employee wrongdoing] should be considered only in determining the amount of damages due to the individual and not in the initial liability stage"). But, Fitchburg contends, this limitation on the jury's consideration of after-acquired evidence has no application to "failure to hire" cases like this one.

Fitchburg, however, has not pointed to a single precedent -- from any court, let alone one from Massachusetts -- which has permitted an employer to rely on after-acquired evidence to defeat the plaintiff's showing of liability for discrimination, whether the discrimination motivates a "failure to hire" or a "wrongful discharge." To the contrary, precedent seems to bar an employer from doing so. See, e.g., Price Waterhouse, 490 U.S. at 252 ("An employer may not . . . prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision." (emphasis added)); McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 360 (1995) ("The employer could not have been motivated by knowledge it did not have [at the time of the decision] and it cannot now claim that the employee was fired for the nondiscriminatory reason."). Therefore, we conclude that the District Court did not err in rejecting Fitchburg's contention

that its instruction to the jury not to consider the after-acquired evidence in determining liability under Chapter 151B requires a new trial.

## D.

We come, then, to Fitchburg's arguments that the jury's award of punitive damages cannot be sustained. First, Fitchburg contends that the evidence was insufficient to support any punitive damages award. In the alternative, Fitchburg contends that the jury's award of punitive damages was unreasonable.

Chapter 151B authorizes the award of punitive damages, see Mass. Gen. Laws 151B, § 9; Int'l Fid. Ins. Co. v. Wilson, 443 N.E.2d 1308, 1317 n.20 (Mass. 1983) ("Under Massachusetts law, punitive damages may be awarded only by statute."), based on "common law and constitutional principles," Dartt v. Browning-Ferris Indus., Inc., 691 N.E.2d 526, 536 (Mass. 1998). And, under Massachusetts law, punitive damages are only warranted for "intentional and outrageous conduct." Haddad, 914 N.E.2d at 63 (emphasis added).

The Supreme Judicial Court ("SJC") has explained, moreover, that "[d]iscrimination [under Chapter 151B] necessarily involves an intentional act." Id. at 75. Therefore, "[t]o sustain an award of punitive damages under [Chapter 151B], a finding of intentional discrimination alone is not sufficient." Id. Instead, the plaintiff must make an additional showing that "the defendant's

- 31 -

conduct is [so] outrageous or egregious. . . . that it justifies punishment and not merely compensation." Id. In other words, "the fact finder should determine that the award is needed to deter such behavior toward the class of which plaintiff is a member, or that the defendant's behavior is so egregious that it warrants public condemnation and punishment." Id.

Our review of whether the evidence suffices to permit an award of punitive damages is de novo. See Intercity Maint. Co. v. Local 254, Serv. Employees Int'l Union AFL-CIO, 241 F.3d 82, 86 (1st Cir. 2001). And, in performing that review, we must be mindful that "[a]n award of punitive damages . . . should be sustained if it could 'reasonably have [been] arrived at . . . from any . . . evidence . . . presented.'" Haddad, 914 N.E.2d at 72 (quoting Dartt, 691 N.E.2d at 536) (alteration in original).

## 1.

In challenging Fitchburg's contention that there was insufficient evidence to support the punitive damages award, Heagney first contends that the record supportably showed that Wong, a public official, knowingly violated Chapter 151B. Heagney further contends that this evidence of Wong's knowledge alone permitted a reasonable jury to find that her conduct was "outrageous or egregious" enough to warrant punitive damages. See Haddad, 914 N.E.2d at 75. Fitchburg counters that, under Haddad, "[a]n award of punitive damages requires a heightened finding

- 32 -

beyond mere liability and also beyond a knowing violation of the statute." Id. (emphasis added). But, we need not decide this dispute over whether, under Haddad, such a showing of a public official's knowledge that her conduct violated Chapter 151B can alone suffice to sustain an award of punitive damages. And that is because we conclude that Heagney did not make the requisite showing of knowledge here in any event.[4]

To show that the evidence does suffice to support a finding that Wong knew that her actions violated Chapter 151B, such that punitive damages may be awarded against Fitchburg under Haddad, Heagney points to testimony from Unsworth and Stephens. They testified that they were aware that Fitchburg could not

---

[4] Haddad does note that prior Massachusetts "cases ha[d] held that . . . a defendant know[ing] that it has acted unlawfully by interfering with the legally protected rights of the plaintiff . . . could be sufficient to support an award of punitive damages." Id. at 73 (citing Clifton v. Massachusetts Bay Transp. Auth., 839 N.E.2d 314, 323-24 (Mass. 2005); Goodrow v. Lane Bryant, Inc., 732 N.E.2d 289, 299 (Mass. 2000); Dartt, 691 N.E.2d at 536-37) (emphasis added). Although acknowledging that "the defendant['s] act[ing] with the knowledge that it was interfering with the plaintiff's right to be free of unlawful discrimination . . . has been . . . one circumstance warranting an award of punitive damages," Haddad stated that "an award of punitive damages has [also] been allowed" where "the defendant's act was otherwise outrageous, egregious, evil in motive, or undertaken with reckless indifference to the rights of others." Id. at 73 (emphasis added). Haddad then announced a "new standard describing the circumstances in which punitive damages may be awarded." Id. at 75 (emphasis added). That new standard, however, does not appear to address a defendant's deliberate or knowing violation of Chapter 151B, and we have found no post-Haddad case sustaining an award of punitive damages on such a basis alone.

lawfully ask candidates about a criminal case not resulting in a conviction and that it could not lawfully exclude a candidate because of the candidate's failure to furnish that information. Heagney also points to a handbook provided by a law firm to Fitchburg on "[b]asic considerations in hiring process," which instructed that "[e]mployers must be careful how they inquire about an applicant's criminal history" and that employers "may not inquire about arrests not resulting in conviction."

But, none of those materials purport to address a situation in which, as was the case here, an employer does not ask an applicant directly about a prior criminal case but learns of it, independently and without prompting the applicant, from a third party. Nor is this case one in which the evidence is such that a reasonable jury "could infer" from the employer's general practices -- unlike, for example, from an employer's general policies prohibiting racial or gender discrimination -- that the defendant "was aware that [the] discrimination was not legally permitted." Haddad, 914 N.E.2d at 73.

There is also "scant case law" in Massachusetts interpreting the Chapter 151B provision at issue, let alone any case law applying that statute to facts remotely like those we have here. In fact, there is some case law that construes the Chapter 151B provision quite narrowly. See, e.g., Bynes, 581 N.E.2d at 1021 (noting that "the [Massachusetts] Legislature's

intent" in enacting Chapter 151B, § 4(9) "was merely to protect employees from such requests from their employers and not to proscribe employers from seeking such information elsewhere"); Ryan v. Chief Admin. Justice of Trial Court, 779 N.E.2d 1005 (Table), 2002 WL 31770115 at *3 (Mass. App. Ct. 2002) (unpublished) (holding that an employer did not violate Chapter 151B § 4(9) where the employer "did not request the information from the plaintiff"); McGowan v. Stoneham Police Dep't, 6 M.D.L.R. 1639, 1648 (1984) (construing the protection afforded by § 4(9) to be "quite narrow in scope" and "directed primarily at the preemployment inquiry, particularly the application form" (internal quotation marks omitted)).

We have here, then, a high degree of "uncertainty of the state of the law in Massachusetts" regarding the conduct at issue. Goodrow, 732 N.E.2d at 299. We also have a paucity of evidence demonstrating knowledge by either Wong or Fitchburg that this particular conduct was unlawful under Chapter 151B. We thus conclude that no reasonable jury could find that Wong "intentionally or willfully violated Massachusetts law," id., such that, under Haddad, for that reason alone the conduct at issue was "outrageous or egregious" enough to warrant punitive damages, Haddad, 914 N.E.2d at 75.

**2.**

Heagney separately responds to Fitchburg's contention that the record does not reflect the "additional level of egregiousness necessary to support an award of punitive damages," Haddad, 914 N.E.2d at 73, by pointing to the portion of the record that purportedly shows that Wong concealed her discriminatory conduct. Specifically, Heagney contends, the record shows that Wong lied at trial by denying that she had read the anonymous letter, that she had withdrawn Heagney's nomination because of his failure to disclose the criminal case, and that she had told Owen the same.

Under Haddad's "definition of outrageous conduct appropriate specifically for discrimination claims . . . under [Chapter] 151B," id. at 75 (emphasis added), a jury is to consider:

1. whether there was a conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part (or the plaintiff because he or she is a member of the class);
2. whether the defendant was aware that the discriminatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise;
3. the actual harm to the plaintiff;
4. the defendant's conduct after learning that the initial conduct would likely cause harm;
5. the duration of the wrongful conduct and any concealment of that conduct by the defendant.

Id. We do not see, though, how the record suffices to support a finding that the first four of these factors had been satisfied. Nor do we see what basis there is in Massachusetts law for finding

- 36 -

that the evidence pertaining to the last of these factors -- concerning concealment -- could alone suffice to support an award of punitive damages in this case. See generally Kiely v. Teradyne, Inc., 13 N.E.3d 615, 620 (Mass. App. Ct. 2014) ("reject[ing] [plaintiff's] argument that a showing on a single Haddad factor is sufficient to support a punitive damages award").

The jury found that Heagney suffered no actual harm from the Chapter 151B violation in that it awarded no compensatory damages to Heagney. See id. at 621; cf. Labonte v. Hutchins & Wheeler, 678 N.E.2d 853, 862 (Mass. 1997) ("scrutiniz[ing] the relationship between actual damages and the award of punitive damages"). And, although we recognize that Massachusetts law imposes no requirement "that punitive damages may only be awarded if there is an award of compensatory damages," Bain v. City of Springfield, 678 N.E.2d 155, 161 (Mass. 1997), the jury's finding of no actual harm to Heagney counsels, at least to some extent, against the imposition of punitive damages under Haddad, see Haddad, 914 N.E.2d at 75; Kiely, 13 N.E.3d at 621.

That is especially so here. There was no basis for a reasonable jury to find that the defendant "was aware that the discriminatory conduct would likely cause serious harm, or recklessly disregarded the likelihood that serious harm would arise," Haddad, 914 N.E.2d at 75, as there has been in other cases in which the second Haddad factor has been found to have been met.

- 37 -

See, e.g., Gyulakian v. Lexus of Watertown, Inc., 56 N.E.3d 785, 799 (Mass. 2016) (finding the second Haddad factor met where the defendant-employer was aware that the plaintiff had made multiple sexual harassment complaints regarding an employee and neglected to initiate an investigation despite the requirement in its sexual harassment policy that it do so); Kiely, 13 N.E.3d at 621 (finding the second Haddad factor met where the employer did not rehire the plaintiff despite being aware that the plaintiff had repeatedly inquired about open positions at least three times and the plaintiff had spent her entire career at the employer and was grandfathered into generous benefits); Dimanche v. Massachusetts Bay Transportation Auth., 893 F.3d 1, 10 (1st Cir. 2018) (noting the employer's failure to act despite "numerous instances of notice to [defendant] of racially-based and racially-demeaning comments made to [the plaintiff]").[5]

Nor could a jury have reasonably concluded that the defendants engaged in a "conscious or purposeful effort to demean or diminish the class of which the plaintiff is a part (or the plaintiff because he or she is a member of the class)."[6] Haddad,

_____

[5] There was thus necessarily also no basis for a reasonable jury to find that "the defendant's conduct after learning that the initial conduct would likely cause harm" counseled in favor of punitive damages. Haddad, 914 N.E.2d at 75.

[6] We note that the District Court's instruction described the first Haddad factor only as "[w]hether the city's conduct was conscious or purposeful" instead of the full formulation. Heagney

914 N.E.2d at 75 (emphasis added).  As the defendant points out, "this case involved a unique set of circumstances[.]"  The mayor learned that the candidate that she had chosen to nominate to be police chief had previously been the subject of criminal and internal investigations for engaging in domestic violence.  She also learned that he had not disclosed that information during an extensive vetting process for this leadership position in law enforcement.  That the mayor decided to withdraw the candidate's nomination in that specific context does not indicate any "purposeful effort" by Fitchburg -- through Wong -- to demean the class that this part of Chapter 151B protects more generally.  Id. And, thus, far from "need[ing] [punitive damages] to deter such behavior toward the class of which plaintiff is a member," id., we agree with Fitchburg that such conduct "is unlikely to be repeated."

Finally, we cannot conclude that evidence of Wong's purported "attempted cover-up" of the statutory violation by allegedly lying at trial constitutes "concealment" of a degree "warrant[ing] public condemnation and punishment." Id. at 75.  To be sure, Heagney points to some precedent supporting the notion that a jury may award punitive damages on the basis of a public

---

does not make any argument, however, that evidence that Fitchburg's conduct was conscious or purposeful (as opposed to its violation of Chapter 151B) supports the award of punitive damages, and Fitchburg does not challenge the instruction.

official's conduct at trial.  See, e.g., Hall v. Ochs, 817 F.2d 920, 927 (1st Cir. 1987) (upholding the jury's award of punitive damages under Massachusetts law in part because of the police officers' conduct at trial); Ciccarelli v. Sch. Dep't of Lowell, 877 N.E.2d 609, 618 (Mass. App. Ct. 2007) (upholding punitive damages award in part because of a superintendent's false testimony at trial).  But this case is readily distinguished from those precedents.

In Hall, the defendants, four police officers found to have engaged in racially motivated false arrests, argued at trial that the plaintiffs' testimony against them was deliberately false and provided a likely fabricated police report to support their allegations.  See Hall, 817 F.2d at 927-28.  "On this evidence, a factfinder might [have] infer[red] that the stark clash could not have resulted from innocent misrecollection, and that its intentional quality intensified any need the jury may have found for punishment and deterrence."  Id. at 928.

In Ciccarelli, moreover, the defendant was a school superintendent who was found to have retaliated against a teacher who was about to testify against the city in a separate hearing by firing her.  At the trial, the superintendent gave false testimony that she did not know about the teacher's prospective testimony.  Ciccarelli, 877 N.E.2d at 618.  But, that evidence was directly contradicted by affirmative evidence of the superintendent's

- 40 -

presence at the hearing where the teacher testified. Id. Moreover, Ciccarelli concluded that the evidence sufficed to show that the superintendent later actively fabricated an excuse that she fired the teacher because the teacher was not on track to complete coursework toward advanced certification. Id. And, the record further showed that the superintendent had offered to reinstate the teacher the day before the teacher's prospective testimony in the hearing, which, Ciccarelli concluded, "the jury could therefore infer . . . was meant to influence that testimony." Id. Ciccarelli thus determined from the totality of this evidence that "such behavior by a high-ranking public official in charge of education of a city's children was outrageous" enough to "place the issue of punitive damages before the jury." Id. at 617-18.

Here, by contrast, Wong's account at trial was that she decided not to nominate Heagney because he had lied on his résumé and application materials regarding prior employment. And, the jury found that Wong's statement that Heagney "was not forthcoming on his résumé about his work experience" was true. Thus, unlike in Hall, 817 F.2d at 928, where the police officers fabricated a police report, or in Ciccarelli, 877 N.E.2d at 618, where the superintendent manufactured an excuse in order to fire the teacher, Wong did not actively fabricate an allegation of misconduct to use as an excuse for her decision not to nominate Heagney.

Nor is the other testimony on which Heagney relies "so egregious as to warrant the condemnation and enhanced deterrence that underlie the imposition of punitive damages." Smith v. Bell Atl., 829 N.E.2d 228, 245 (Mass. App. Ct. 2005). As to Wong's answer "no" when asked if she had read the anonymous letter, Wong immediately qualified her answer by stating that she "didn't really read the letter," but instead "perused it and saw that it was something related to Scott Heagney, and . . . forwarded it to Mr. Stephens to be part of his file." Similarly, Wong's answer "no" when asked if she told Owen that she "could no longer support Mr. Heagney because he had not disclosed the early criminal charge" was immediately qualified by a statement "that is what [Owen] wrote without quotes."

Of course, the jury's finding for Heagney on the Chapter 151B claim suggests that it did not credit some of Wong's testimony concerning her motivation for withdrawing his nomination. But, "the fact that the jury drew an inference against [Wong] does not equate with positive evidence that [s]he lied or . . . orchestrated a cover up." Kiely, 13 N.E.2d at 622. Thus, the most that Heagney has offered is an "assert[ion] that the jury's apparent disbelief of [Wong's] testimony . . . is also proof that [Wong] attempted to cover up [her] wrongdoing." Id. at 621-22. But, as Kiely shows, that alone is not enough to support punitive damages. See id. at 620.

We thus do not see how the record reflects conduct so "outrageous or egregious" so as to require punitive damages in order to "deter such behavior" or to express "public condemnation and punishment[.]"[7] Haddad, 914 N.E.2d at 75. Because we conclude that there was insufficient evidence to support the award of punitive damages under Haddad, we need not reach whether the award was unreasonable or excessive. Accordingly, the award of punitive damages is reversed.

## IV.

For the foregoing reasons, we reverse the judgment on the defamation claim, affirm the judgment on the Chapter 151B claim, and reverse the award of punitive damages on the Chapter 151B claim. Each party shall bear its own costs.

---

[7] Wong was an official "charged with the public duty to enforce the law equally," Dalrymple v. Winthrop, 740 N.E.2d 204, 211 (Mass. App. Ct. 2000), and that fact may give her actions "a heightened degree of reprehensibility," Clifton, 839 N.E.2d at 323; see also Kiely, 13 N.E.3d at 622 n.6 (noting that this "factor" was "absent from the case at bar"). But, Heagney makes no argument -- nor have we found any post-Haddad authority suggesting -- that Wong's status as a public official alone is sufficient to sustain a jury's award of punitive damages for a Chapter 151B violation by the city that employs that official in a case involving facts like these. Compare with Clifton, 839 N.E.2d at 316 (upholding award of punitive damages against city transit authority where "both supervisors and coworkers" engaged in extensive racial discrimination against a plaintiff "throughout nine years of his employment").